[No. B139434. Second Dist., Div. Four. Aug. 6, 2002.]

STEPHANIE ALVAREZ, a Minor, etc., et al., Plaintiffs and Appellants,
v.
JACMAR PACIFIC PIZZA CORPORATION et al., Defendants and
Respondents.

**COUNSEL**

Law Office of Robert Scott Shtofman, Louis Jasper Cutrone and Robert Scott Shtofman for Plaintiffs and Appellants.

Yoka & Smith, Walter M. Yoka and Daniel F. McCann for Defendants and Respondents.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

This case involves a commercial enterprise's liability for a murder committed at its restaurant. After the plaintiffs had completed their case-in-chief, the trial court granted nonsuit. In essence, it found no duty because the murder was unforeseeable. We agree and therefore affirm the judgment.

## STATEMENT OF FACTS

*The Operative Facts*

The events occurred during the late evening of May 11, 1996, at Shakey's Pizza Restaurant on Sunset Boulevard in Hollywood.[1] Carlos Alvarez went with a group of friends to eat at the restaurant. Alvarez's companions included three adult men, three adult women, and two young children.

After the group ordered their food, the men took the children to the restaurant's game room. The three women remained at their table. At a nearby table, a group of three men with a video camera were seated: Mauricio Ajanel, Victor Ajanel, and Edwin Estrada (the Ajanel group). The three men were intoxicated. They made obscene remarks to the women and aimed the video camera at the women in an offensive manner. Osvaldo Baldolomar, a restaurant employee, observed the videotaping. However, the women did not complain to the restaurant's employees; instead they told Alvarez and their other male companions (the Alvarez group).

Alvarez and his friends confronted the three men who were leaving the restaurant. Alvarez asked why they were "disrespecting" the women. A loud argument ensued between the two groups. At one point, Victor Ajanel, who had the camera, challenged Alvarez "to a fight." Alvarez accepted the challenge. Baldolomar, a restaurant employee, approached and tried to calm everyone down. He told them he was going to call the police. Someone in the Ajanel group said: "Let's take it outside." Baldolomar reported the incident to his manager, Librado Zepeda. Zepeda unsuccessfully tried to calm down the two groups. Santiago Guerrero, a restaurant employee, made a 911 call because the loud argument was escalating.[2] The two groups then went outside to the restaurant's parking lot as did some of the restaurant employees.

A brief pushing and shoving match followed in the parking lot. Swings were exchanged but no one was hurt. Most of the people soon returned to the restaurant. As they entered, Mauricio Ajanel said to Carlos Alvarez: "Your bitches are not worth fighting for" and "It was not worth filming 'those bitches.'" Alvarez responded by punching Ajanel in the face. Zepeda, the

---

[1] The defendants are four business entities involved with the restaurant, collectively "the restaurant."

[2] A tape recording of the telephone call was played for the jury but not transcribed. The tape was never formally moved into evidence and thus is not part of the record on appeal.

restaurant manager, heard Ajanel state: "We'll see you later."[3] A customer, Anjel Mejia, also may have heard Ajanel state: "I'll be back."

Victoria Holguin heard Ajanel say in a mad tone: "[T]his isn't going to stay like this." Holguin never told a restaurant employee about this statement. Before the Ajanel group left the restaurant, Lenin Lopez, a customer, heard Mauricio Ajanel say something to the effect that they should go back to the house, retrieve a weapon, and return. Lopez did not tell any restaurant employee what he had heard.

As the Ajanel group walked through the parking lot, Pedro Valles, a member of the Alvarez group who had remained outside, heard Victor Ajanel say, in an "angry and agitated" voice: "I'm going to warm that thing up, I want to go home and get the shotgun. And shoot these [people]." No other member of the Alvarez group nor any restaurant employee was present when this statement was made.

Meanwhile, the Alvarez group returned to their table. Alvarez said he "wanted to leave." Soon thereafter, an unidentified restaurant employee came to the table and asked what the fight had been about. Alvarez told the employee he wanted to leave. The employee responded, "everything was going to be taken care of, that there was no problem, that everything was going to be fine." The employee brought the group its dinner.

Valles reentered the restaurant. He did *not* tell any of the restaurant employees about Ajanel's statement but did inform his friends, including Alvarez, about it. The Alvarez group was not concerned because a restaurant employee had just told them: "Everything is okay. We called the police." Someone in the Alvarez group told Valles: "Don't worry about it. These guys . . . are not coming back." No one in the Alvarez group told any restaurant employee about what Valles had heard.

The Alvarez group remained to eat their dinner. Los Angeles Police Officers Roussett and Bender arrived in response to the 911 call Guerrero had made. From plaintiffs' point of view what happened next is crucial because, according to their appellate brief, the "negligence in this case was not the breach of some obscure duty to provide expensive or otherwise burdensome security measures to protect [them] from some generally unforeseeable act of a random third party criminal, but rather the breach of a

---

[3]In a declaration executed before trial, Guerrero (a restaurant employee) averred that "when Mr. Zepeda came back into the store I [Guerrero] had a conversation with him. He told me the men who had left and had been fighting told everyone they would be coming back." However, at trial Guerrero denied that "after Zepeda . . . came back from the parking lot," Zepeda either spoke with him or told him "that the individuals who had been fighting told everybody they'd be coming back."

specific, assumed duty to act reasonably under the circumstances by properly informing the police of the risks of violence [the restaurant] knew existed in the Shakey's that evening."

Guerrero testified he told Officer Roussett "the fight had already dispersed," a fact confirmed by the officer's observations of the premises. However, there is a conflict in the record as to what else Guerrero told the police. We set forth that conflicting evidence in detail because plaintiffs place great emphasis on this conflict in contending the trial court erred in granting the nonsuit. At one point in his testimony, Guerrero testified he did not tell the police it "was okay for them to leave." He was later confronted with an October 2000 pretrial declaration prepared by plaintiffs' counsel which averred: "Based upon what Mr. Zepeda told me, I told the police that everything was okay and it was okay for them to leave." Guerrero then responded "[y]eah" to the following question: "Is the reason that . . . you told the police that it was okay for them to leave [was] because no one told you that the shooter was coming back?" However, an even earlier pretrial declaration also prepared by plaintiffs' counsel and signed by Guerrero in September 1998 stated: "He [Zepeda] told me that the men who had left had been fighting, told everyone that they would be coming back." Guerrero testified, however, that he signed that latter declaration without having read it thoroughly and that Zepeda had never told him the Ajanel group would return. (See fn. 3, *ante.*)

At oral argument, plaintiffs' counsel made much of this evidentiary conflict. At first he claimed Guerrero's statement to the police that "everything was okay" was a material misrepresentation because Guerrero knew, in fact, that Ajanel had said he would return. At another point, plaintiffs' counsel speculated that had Guerrero told the police Ajanel said he would return, the police would have interviewed the Alvarez group and the restaurant's patrons and would have learned about the statements heard by Lopez and Valles that the Ajanel group had said it would return with a gun. As will be explained below, both of these arguments lack merit.

In any event, Guerrero testified that he told the police the Ajanel group had left the premises and pointed out the Alvarez group to the officers. Officer Roussett did not speak with the group. It is unclear whether Officer Bender spoke with them. Three customers testified they did not see the police approach the Alvarez table and one member of the Alvarez group testified the police did not come to their table. In contrast, Officer Roussett testified he saw Officer Bender speak with a group seated in the same vicinity as the Alvarez group was located later that evening. Officer Roussett

did not hear the conversation.[4] (Officer Bender did not testify at trial.) Valles testified he waved at the officers but did not speak with them. He conceded: "I don't know if they did see me. I doubt they did." Valles did nothing else to gain the officers' attention. Valles never told either officer about the threat he had heard in the parking lot. Lastly, Lopez, the customer who had earlier heard Mauricio Ajanel threaten he would leave to obtain a weapon and return, did not tell the police about this threat. The police left.

Within 30 minutes, the Ajanel group returned. Edwin Estrada stood at the door and motioned to the Alvarez group to come outside. The Alvarez group ignored him. Carlos Alvarez joked: "Look they came back, I don't think they have had enough. . . . It seems like they want more." Mauricio Ajanel entered the restaurant, walked within five feet of the table, said "I told you I was going to come back," and fatally shot Alvarez in the chest. Ajanel ran out of the restaurant and escaped. He was eventually apprehended and convicted of murder.

In regard to the significance of Mauricio Ajanel's statements heard by the restaurant employees that he would return, Captain Ronald Sanchez of the Los Angeles Police Department (LAPD) testified that the statement, "I'll see you later," or its equivalent made after a fight does not qualify as a threat under LAPD guidelines requiring police intervention. For the police to consider a statement a threat, it must specify imminent harm. An example would be, "I'm going to come back with a weapon, I'm going to use it on you." If the latter type of statement were made, the police would inform the victim of the potential danger. In a similar vein, Officer Roussett testified had Guerrero told him Ajanel had stated he was going to return with a gun, the police would have advised the victim(s) to leave and would have attempted to locate the suspects.

*Prior Incidents of Violence at the Restaurant*

On the issue of prior acts of violence occurring at the restaurant before the May 11, 1996 murder of Alvarez, plaintiffs offered the testimony of Jorge Guerrero, a Shakey's employee from 1990 to 1996.[5] From 1993 to 1995 he worked as an assistant manager at the location at which Alvarez was murdered. Guerrero testified to three specific incidents.

The first occurred before or during 1994, as Guerrero was leaving work and walking through the parking lot. A homeless woman asked him for

---

[4]Officer Roussett also saw Officer Bender speak with Guerrero but did not hear that conversation.

[5]He is the brother of Santiago Guerrero who worked at the restaurant the evening Alvarez was murdered.

money. He declined. She pointed a gun at him but then laughed and walked away. Guerrero assumed she was a "crazy woman."

The second occurred in February 1994 when a customer tried to take food from the restaurant without paying. When confronted by the manager, the customer hit the manager with a tray. A fight ensued until the restaurant employees were able to handcuff the man. The police arrested the customer.[6]

The third occurred during the summer of 1995. Two customers became engaged in an argument. Guerrero asked them to leave the restaurant. Before they left, one of the men threatened Guerrero, stating he would return. The man, in fact, did return 40 minutes later with several companions. He walked to the cash register, displayed a gun in his waistband, and grabbed the cash register. When Guerrero resisted, the man pushed the cash register over and fled. Based upon a suggestion from the police, Guerrero transferred to another location.

*The Trial Court's Statement of Decision*

The trial court issued a seven-page decision granting the nonsuit. After canvassing the evidence, it explained:

"In cases such as here presented, where plaintiffs sue a party in negligence for damages produced by the criminal conduct of a third party, the crucial factor in duty analysis is foreseeability. *Sharon P. v. Arman, Ltd.*, 21 Cal.4th 1181, 1189 [91 Cal.Rptr.2d 35, 989 P.2d 121] (1999) (*Sharon P.*). Foreseeability, when examined to determine the existence or scope of a duty, is a question of law for determination by the court. *Ann M.* [*v. Pacific Plaza Shopping Center* (1993)] 6 Cal.4th [666,] 678 [25 Cal.Rptr.2d 137, 863 P.2d 207]. The criminal acts producing the harm complained of must be 'foreseeable criminal acts of third parties that are likely to occur . . . .' *Id.*, at 674. This general analysis applies to all of plaintiffs['] duty theories.

"Unlike prior reported cases decided at the demurrer or summary judgment stages, the court here has the benefit of a fully developed factual record. The court gives plaintiffs full benefit of all the evidence presented for purposes of deciding defendants' motions for nonsuit. *Nally v. Grace Community Church*, 47 Cal.3d 278, 291-92 [253 Cal.Rptr. 97, 763 P.2d 948] (1988).

"The injuries here complained of all flow from one of the worst forms of violence the human mind can imagine—murder. No one who testified in

---

[6]The restaurant manager, Peter Schuttelhofer, also testified about this incident.

court and who was present at the restaurant that night thought, even in passing, that a murder might occur. The legal test of foreseeability, however, is objective rather than subjective.

"Plaintiffs vigorously argue that the court must not concern itself with the fact that the injuries flow from a murder. However, the nature and quality of the act ultimately producing the injury-inflicting harm cannot be ignored. As an example. In *Sharon P.*, plaintiff was *sexually assaulted* in a commercial parking structure, and sought to hold the business operator liable. There, the California Supreme Court described its foreseeability equation as follows: 'The critical issue in this case is whether a *sexual assault* by a third party in the tenant garage was sufficiently foreseeable. . . .' *Sharon P., supra*, at 1188 (emphasis supplied). Foreseeability can be established by the occurrence of similar non-identical events, but the nature of the ultimate injury-producing conduct is not thereby rendered irrelevant for foreseeability analysis purposes.

"By all accounts, the level of violence occurring in the parking lot, and with Mr. Alvarez's punching the man in the nose, is a quantum legal leap from a cold-blooded murder committed point blank with a .357 caliber pistol. Plaintiff argues that a punch in the nose is in the same foreseeability class as premeditated murder. The court disagrees as a matter of law. The law on point is well-stated by the Restatement of Torts 2d:

" 'The actor's conduct may be held not to be a legal cause of harm to another where after the event and looking back from the harm to the actor's negligent conduct, it appears to the court highly extraordinary that it should have brought about that harm.' Rest. 2d Torts, § 435.

"The court finds that the events occurring at the restaurant on the night of the incident do not individually or collectively rise to the ·level of foreseeability that would place the injury-producing harm within the scope [of] a duty owed by defendants to plaintiffs. The court finds it highly extraordinary that the injury-producing harm could have been brought about by any act or omission by Shak[e]y's that could be considered negligent.

"The fact that the Shak[e]y's employee who called 911 may have known of a statement to the effect 'I'll be back' and did not inform police of the statement does not alter the result, even if his omission played a role in the ultimate result. 'I'll be back,' or a similar statement, does not, in these circumstances, bridge the breathtaking gulf in legal nexus between pushing, shoving and a bloody nose on the one hand and cold-blooded murder on the other.

"Neither is the legal void filled by evidence of prior events on the Shak[e]y's premises. The prior events of most significance here were an attempted cash register robbery involving a handgun and an incident in which an unidentified woman pointed a handgun at a Shak[e]y's employee in the parking lot. The most recent of these events occurred nearly one year prior to the Alvarez murder.

"Without minimizing the nature of these prior incidents, and other lesser events cited by plaintiffs, the court finds that they do not create a legal duty on the part of Shak[e]y's with respect to the Alvarez murder. The gun-related incidents are remote in time. More importantly, they do not alone, or together with other events, increase the legal foreseeability that a patron might return with a gun to commit murder. A prior event has significance in connection with the scope of legal duty if the prior event materially alters the probability of harm in a reasonably foreseeable manner. *See Sharon P., supra; Ann M., supra; Nicole M. v. Sears, Roebuck & Co.,* 76 Cal.App.4th 1238 [90 Cal.Rptr.2d 922] (1999). The prior events in evidence here did not, as a matter of law, sufficiently alter the risk of harm beyond that which would otherwise have existed so as to provide the necessary foreseeability to bring the harm complained of within the scope of a legal duty owed by defendants to plaintiffs.

"Defendants' motions for nonsuit are granted, and judgment is hereby rendered in favor of defendants on all causes of action."

### DISCUSSION

#### A. *The Trial Court's Grant of Nonsuit Was Based upon Grounds Raised by Defendants*

██ A trial court may grant nonsuit only on the ground(s) raised in the defense moving papers. (*Marvin v. Adams* (1990) 224 Cal.App.3d 956, 960 [274 Cal.Rptr. 308].) Plaintiffs[7] contend that principle was violated because defendants' "nonsuit motion was granted on grounds not specifically stated by [defendants] in their moving papers, but instead, were granted on grounds stated by the trial court (sua sponte)." A close reading of the record indicates this contention lacks merit.

*Factual Background*

1. *Plaintiffs' Complaint*

At the time of trial, the operative pleading was plaintiffs' third amended complaint. Insofar as is relevant to this contention, it alleged causes of action

---

[7]The plaintiffs are the murdered man's daughter, mother, and girlfriend.

for premises liability; negligence; and negligent hiring, training, supervision and/or retention.

The premises liability cause of action alleged defendants "[f]ailed and refused to provide a reasonably safe premises." Plaintiffs alleged a series of "numerous similar violent crimes" gave defendants "notice of a foreseeable risk of harm from third party criminals," thereby creating a duty to protect and warn plaintiffs.

The negligence cause of action alleged that defendants' employees "by calling the police and informing the police officers of" what had happened at the restaurant, had "undertak[en] to assist plaintiffs [and Alvarez], and [therefore] assumed a duty to do so with reasonable care." Plaintiffs further alleged they relied upon the employees to provide assistance and therefore took no action such as speaking with the police or leaving the restaurant. Plaintiffs alleged defendants breached this duty by "fail[ing] to inform the police officers that the third-party assailants indic[a]ted their intent to return to the restaurant for the purpose of committing grave bodily injury" on Alvarez and his companions.

The cause of action for negligent hiring, training, supervision, and/or retention alleged: (1) failure to perform adequate background checks on defendants' employees to determine if they were suited to provide a reasonably safe premises; (2) failure to provide adequate training as to how to respond to criminal activities on the premises; (3) failure to provide proper supervision of employees which had it been provided would have prevented the killing; and (4) negligent retention of employees after "at least thirty-two (32) prior documented incidents of assaults, batteries, and other violent crimes upon persons had occurred at [the restaurant]." (Italics omitted.)

### 2. *Defendants' Motion for Nonsuit*

After plaintiffs presented their case-in-chief, defendants moved for nonsuit. The motion did not distinguish between the three individual theories of negligence found in plaintiffs' third amended complaint. The motion urged: "These defendants had no duty of care to the plaintiffs, unless plaintiffs establish that there was a high degree of foreseeability in regard to the subject incident. Foreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court. [¶] The evidence produced by the plaintiffs in this case, as interpreted under existing case law, must result in the conclusion that the subject incident was not reasonably foreseeable by the defendants, and therefore defendants owed no duty of care to the plaintiffs and the case must be dismissed." Defendants

cited recent decisional law to argue the evidence was insufficient as a matter of law to establish a duty to prevent Alvarez's murder.

Plaintiffs' opposition, in addition to arguing the merits, claimed the nonsuit motion addressed only the premises liability theory, not the claims for negligence and negligent hiring.

### 3. *The Hearing on the Nonsuit Motion*

At the beginning of the hearing, the court raised the scope of the nonsuit motion. It stated it had interpreted the motion as addressing the entire complaint. Defense counsel responded that was correct. He stated the issue of the existence of a duty of care embraced all of the causes of action and that "[p]laintiff[s'] efforts to confine [the] motion to the premises liability cause of action [is] inappropriate." Plaintiffs' counsel, on the other hand, argued that a different analysis of duty applied to the theories of negligence and negligent hiring. The parties addressed this difference in approach throughout the 30-minute hearing on the motion.

The court stated the foundational question of whether a duty existed was one of law for it to determine, a point with which plaintiffs' counsel expressly agreed. The court held that regardless of the particular rubric of the plaintiffs' claim (premises liability, negligent training, or simple negligence), the foundational issue in each was whether a duty existed and that would be determined by analyzing the foreseeability of the *specific* harm suffered—the murder. At the close of the hearing, the court stated: "[T]here is no theory that has been asserted in this case, in this complaint, or supported by any of the evidence that is presented to this court, that would allow this case to go forward to this jury."

### Discussion

The above chronology demonstrates the trial court's grant of nonsuit was based upon grounds raised in the defendants' motion. Defendants' motion urged plaintiffs had failed to establish defendants owed a duty of care because of the unforeseeability of the violent response engendered by the initial confrontation. At the beginning of the hearing, the court confirmed its belief that defendants' motion addressed *all* of the negligence causes of action. Plaintiffs disagreed but not because of the content of defendants' motion. Instead, their disagreement was a legal one; they simply did not agree that the same foreseeability analysis applied whether the theory was negligence, premises liability, or negligent training and supervision. As we shall discuss below, plaintiffs are wrong on that point. It is therefore

apparent the trial court granted the nonsuit motion on the grounds urged by defendants and opposed by plaintiffs.

## B. *Exclusion of Hearsay Evidence*

Plaintiffs contend the trial court misapplied the hearsay rule in finding inadmissible evidence they sought to present that allegedly established prior similar occurrences at the restaurant. We conclude the court did not abuse its discretion in finding the evidence to be inadmissible multiple hearsay.

*Factual Background*

Plaintiffs sought to introduce the LAPD's computer dispatch logs for 911 calls made from the restaurant for the 18 months preceding Alvarez's murder. A dispatch log is a computer-generated report of a 911 call. The recorded information includes the phone number from which the call was placed, the time of the call, and the nature of the emergency.

Two of the documents indicated all the calls were placed from (213) 663-2145. Plaintiffs' counsel made an offer of proof the phone number was that of the restaurant's private office, not a public pay phone. Defense counsel did not dispute this. The court accepted the offer of proof. Plaintiffs called Kim Hunter, LAPD custodian of records, to qualify the records as official records pursuant to Evidence Code section 1280. Hunter explained how the records were prepared and testified the records accurately reflected that the 911 phone calls were made from the restaurant to the police.

Plaintiffs also offered 10 other documents which set forth the contents of the 911 calls placed by third parties from the restaurant. Hunter testified this data was input into the computer by public employees at the same time the calls are placed. Through these documents, plaintiffs sought to establish prior similar acts had occurred at the restaurant because in each phone call, the caller apparently reported a specific crime or act of violence then taking place. With that evidence, plaintiffs sought to argue Alvarez's murder was foreseeable so that the restaurant had a duty to prevent its occurrence.

Plaintiffs moved to admit the documents into evidence "pursuant to [the] business records exception of the hearsay rule." Plaintiff's counsel urged the "documents are circumstantial evidence of notice on behalf of the restaurant of the incidents."

Defense counsel objected: "The business record exception has not been met, in the first instance; number two, even if it was met[,] it's plane [*sic*]

hearsay under the Evidence Code, and multiple hearsay and should be ruled inadmissible by the court."

The following exchange occurred:

"[Plaintiff's counsel]: What we would like these records to demonstrate is . . . circumstantial evidence of the ultimate facts that these incidents did take place. They are direct evidence that police units were dispatched to that unit for the specific reasons indicated in the log. With regard to the business records exception, they—the code states that in order to satisfy the requirements of that exception, that the records must be made in the usual course of business, contemporaneously with the event by a public employee, that has been—the foundation for that has been laid. With regard to the second layer of hearsay to the extent that it exists on any of the given documents, the calls were made by employees of Shakey's, that's indicated on the log, the—there's been testimony by Mr. Schuttelhofer [the general manager of the restaurant] that employees were authorized to make these 911 calls,[8] as such they are an authorized admission under the code. [¶] . . . [¶]

"[Defense counsel]: The argument by counsel doesn't change the conclusion that this is a classic multiple hearsay disallowed by just about every court that I think has examined this particular issue. In addition to which the witness testified that she could not provide any information with regards to the reliability or accuracy of any of the information contained on the documents.

"The Court: All right. The court finds based on the evidence that has been presented to it, and in its role as a finder of preliminary fact for the purpose of admission of evidence, that there is not adequate evidence on this record to satisfy any of the hearsay exceptions as required in the specific instances of this particular case, and for the purposes for which it would be offered."

*Discussion*

The analytical flaw in plaintiffs' contention that the trial court erred in disallowing the records is its failure to recognize and address the fact that the records were *multiple* hearsay. That is, the records were offered to prove two points. The first is that the 911 calls were placed to the LAPD. The second

---

[8]Plaintiffs' brief does not include any citation to Schuttelhofer's testimony to support trial counsel's claim the restaurant employees were authorized to make 911 calls. Our review of Schuttelhofer's testimony found only the following reference to 911 calls. Schuttelhofer testified there was "a written policy at that restaurant that whenever an incident which required 911 to be called, or the police to be called," that the employee was also to contact Richard De Anda, a private security consultant retained by the restaurant.

is that a particular action or crime was taking place at the restaurant as reflected in the statements made to the 911 operator by the individual(s) who placed the phone calls. When multiple hearsay is offered, an exception for *each* level of hearsay must be found in order for the evidence to be admissible. (Evid. Code, § 1201.)

In this case, Hunter's testimony that the public employees who took and recorded the calls were obligated to record the information in an accurate manner laid the foundation for the admission of the records as official records to establish that the 911 calls were placed to the LAPD.[9] However, that testimony did not and could not lay a sufficient foundation to permit the records to be offered for the truth of the matter asserted in the calls by the individuals who telephoned the LAPD because those individuals were not under a duty to accurately report information. (See, e.g., *People v. Hernandez* (1997) 55 Cal.App.4th 225, 240 [63 Cal.Rptr.2d 769] [business records exception inapplicable to police reports based upon observations of victims or witnesses who have no official duty to observe and report the relevant facts].)[10]

*People v. Baeske* (1976) 58 Cal.App.3d 775 [130 Cal.Rptr. 35] illustrates this point. There, the defendant committed a robbery. The victim reported the defendant fled in a vehicle with a license plate No. 468 ABC. (*Id.* at p. 779.) Defendant was later arrested in a car with that license plate. At trial, the defendant sought to admit a police report which set forth the contents of a telephone call received by the police from a civilian-witness that the license plate number of the robber's car was not 468 ABC but instead was

---

[9]Evidence Code section 1280 provides:

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies:

"(a) The writing was made by and within the scope of duty of a public employee.

"(b) The writing was made at or near the time of the act, condition, or event.

"(c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

[10]The Law Revision Commission comment to the business records exception (Evid. Code, § 1271) states: " 'The chief foundation of the special reliability of business records is the requirement that they must be based upon the first-hand observation of someone whose job it is to know the facts recorded. . . . But if the evidence in the particular case discloses that the record was not based upon the report of an informant having the business duty to observe and report, then the record is not admissible under this exception, to show the truth of the matter reported to the recorder.' [Citations.] [¶] Applying this standard, the cases have rejected a variety of business records on the ground that they were not based on the personal knowledge of the recorder or of someone with a business duty to report to the recorder. *Police accident and arrest reports are usually held inadmissible because they are based on the narrations of persons who have no business duty to report to the police.* [Citations.]" (Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 1271, pp. 315-316, italics added.)

either 416 or 614. (*Id.* at p. 780.) The trial court ruled the report was inadmissible hearsay. The appellate court upheld that finding. It reasoned: " 'Thus, a public employee's writing, which is based upon information obtained from persons who are not public employees, is generally excluded because the "sources of information" are not "such as to indicate its trustworthiness" . . . .' [Citations.] In the instant case, [the civilian witness], the source of the information [about the license plate], was not a public employee with any duty either to observe facts correctly or to report her observations accurately to the police department. The trial court was correct, therefore, in ruling that the proffered police report was inadmissible hearsay." (*Id.* at pp. 780-781.)

In this case, it is undisputed the individuals who placed the 911 calls had no duty to correctly observe and report facts. Consequently, the required indicia of trustworthiness is lacking, rendering the documents inadmissible hearsay.[11]

Alternatively, plaintiffs argue the documents "constituted highly relevant *circumstantial* evidence that there were prior similar occurrences of violence" at the restaurant. (Italics added.) This argument misses the mark. The documents, *if* relevant, were *direct* evidence prior crimes had occurred at the restaurant and were therefore being offered for the truth of the matter asserted. That is, the documents were relevant only if the individual placing the call from the restaurant was truthfully and accurately reporting a crime was being committed. But, as explained above, if offered for that purpose, the documents were inadmissible multiple hearsay.

*People v. Baeske, supra,* 58 Cal.App.3d 775, considered and rejected an argument similar to that being made by plaintiffs that the evidence was being offered for a nonhearsay purpose. There, the defense argued the evidence was not being offered for the truth of the matter asserted (to show the license plate of the getaway car was not 468 ABC) but was offered merely to

---

[11]Before the court conducted the hearing to determine the admissibility of the documents, plaintiffs filed a "Reply to Defendants' Objection to Admitting the Police Dispatch Logs ('911' Calls) into Evidence." The seven-page reply contained an oblique acknowledgment the documents contained multiple hearsay and made a cursory argument the phone calls were authorized admissions of the restaurant employees. (See Evid. Code, § 1222.) At the hearing, plaintiffs' counsel made only passing reference to that theory. On this appeal, plaintiffs do not explicitly pursue that argument other than to state: "Appellants incorporate herein by reference, those arguments made in that written reply brief, as though fully set forth at length." We decline to consider the particular issue of whether the phone calls qualified as authorized admissions. Plaintiffs' presentation in the trial court on this theory was superficial and conclusory. Their appellate brief does nothing to elaborate the theory. It is not our responsibility to develop an appellant's argument. (See, e.g., *Dills v. Redwoods Associates, Ltd.* (1994) 28 Cal.App.4th 888, 890, fn. 1 [33 Cal.Rptr.2d 838].)

establish a report of another license plate had been made. The appellate court found that argument to be fallacious. It reasoned: "If offered for the *non-hearsay* purpose indicated, the evidence was inadmissible on the ground of *irrelevancy*. The evidence was obviously being offered by the defense to prove that the victim . . . was mistaken in his testimony as to the license number of the get-away car and that the license number of that car was one of the numbers contained in the police report as emanating from [the civilian witness]. The document was thus being proffered in evidence to prove the truth of the matter stated therein. Thus, the statement [the civilian witness] made to the police was hearsay and inadmissible unless it qualified under one of the exceptions to the hearsay rule." (*People v. Baeske, supra,* 58 Cal.App.3d at p. 780.)

By a parity of reasoning, the documents offered by plaintiffs were only relevant if offered for the truth of the matter asserted: to prove violent acts were being committed at the restaurant. For that purpose, they were inadmissible multiple hearsay.

### C. *The Trial Court Properly Granted Nonsuit on the Merits*

*Governing Legal Principles*

In two recent cases, the California Supreme Court addressed the question of a landowner's liability for criminal acts. We begin with a review of those precedents.

In *Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th 666 (*Ann M.*), the plaintiff worked in a store located in a shopping center. One early morning, a man entered the store and raped her. In the preceding two years, bank robberies, assaults, and purse snatchings had been committed in the shopping center. (*Id.* at p. 671.) Additionally, there was a history of transients loitering in the center. (*Id.* at pp. 671-672.) The plaintiff sued the shopping center for negligent failure "to provide adequate security to protect her from an unreasonable risk of harm." (*Id.* at p. 672.) The trial court granted summary judgment to the shopping center finding it owed no duty because the rape was unforeseeable.

Our Supreme Court began its review of the case by noting that "[t]he existence of a duty is a question of law for the court" (*Ann M., supra,* 6 Cal.4th at p. 674), a principle with which plaintiffs on this appeal do not quarrel. The court explained that "a duty to take affirmative action to control the wrongful acts of a third party will be imposed only where such conduct can be reasonably anticipated. [Citations.]" (*Id.* at p. 676.) Foreseeability is

the crucial factor in determining the existence of this duty (*id.* at pp. 676-677) and "[f]oreseeability, when analyzed to determine the existence or scope of a duty, is a question of law to be decided by the court. [Citations.]" (*Id.* at p. 678.) The court concluded that "the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises." (*Id.* at p. 679, fn. omitted.) In reaching that conclusion, the court expressly disavowed its earlier opinion in *Isaacs v. Huntington Memorial Hospital* (1985) 38 Cal.3d 112 [211 Cal.Rptr. 356, 695 P.2d 653] which, by focusing on the totality of the circumstances, had held foreseeability could be established despite the absence of prior similar incidents on the premises. (*Ann M.,* at pp. 677-679.)

Based upon that analytical framework, the court concluded "that violent criminal assaults were not sufficiently foreseeable to impose a duty upon [the shopping center] to provide security guards in the common areas." (*Ann M., supra,* 6 Cal.4th at p. 679.) Assuming the shopping center had notice of the prior assaults and robberies on its premises, the court held those crimes were not sufficiently similar in nature to the rape to make the rape foreseeable and thus impose a duty upon the center to prevent it. (*Id.* at pp. 679-680.)

In *Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th 1181 (*Sharon P.*), the plaintiff was sexually assaulted at gunpoint at 11:00 a.m. in an underground parking garage as she was leaving her car. The plaintiff worked in the office building and the garage was reserved for tenants of the building. She sued the owner of the premises and the company which provided the parking services alleging that their failure to provide adequate security resulted in the attack. She pointed out various ways the garage was dangerous including darkened areas and an inoperative security camera. She also established that the two years prior to her rape, there had been seven robberies in the bank which occupied the ground floor of the building. (*Id.* at pp. 1186-1187.) Notwithstanding that showing, the trial court granted summary judgment to defendants, concluding the rape was unforeseeable and thus defendants had no duty to prevent it.

The Supreme Court affirmed the grant of summary judgment, applying the standard set forth earlier in *Ann M.* It reasoned: "Significantly, the prior robberies, which all specifically targeted a bank elsewhere on the premises and did not involve violent attacks against anyone, were not sufficiently similar to the sexual assault inflicted upon plaintiff to establish a high degree of foreseeability that would justify the imposition of such an obligation." (*Sharon P., supra,* 21 Cal.4th at p. 1191.) In a similar vein, the court rejected plaintiff's argument that defendants were obligated to adopt various security

measures which might have diminished the risk of the attack because of the absence of "any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults in that location." (*Id.* at p. 1199.)

In *Nicole M. v. Sears, Roebuck & Co., supra,* 76 Cal.App.4th 1238 (*Nicole M.*), the Court of Appeal applied *Ann M., supra,* 6 Cal.4th 666,[12] to a situation in which the plaintiff was the victim of an attempted rape as she traversed the defendant's parking lot at night. She claimed the defendant could have prevented the sexual assault by providing better lighting and landscaping. There had been no prior sexual assaults at the location. The trial court granted the defendant's motion for summary judgment.

On appeal, the plaintiff attempted to avoid the force of *Ann M.* by arguing a showing of prior similar incidents was necessary only if the negligence claim was based upon the failure to provide security guards but that a showing of prior similar incidents was not necessary when, as in her case, she simply sought lesser security measures such as more lighting and the trimming of bushes. The Court of Appeal rejected that argument. It reiterated that "the predicate of any duty to prevent criminal conduct is its foreseeability. Property owners have no duty to prevent unexpected and random crimes." (*Nicole M., supra,* 76 Cal.App.4th at p. 1247.) It concluded "that the low lighting and overgrown bushes alone did not make the property inherently dangerous and further that these circumstances were not cause for the property owner to reasonably anticipate crime in the absence of prior similar incidents." (*Id.* at p. 1248.)

*The Standard of Review*

"In determining whether a nonsuit was properly granted the reviewing court must resolve every conflict in testimony in favor of the plaintiff and at the same time indulge in every presumption and inference which could reasonably support the plaintiff's case. [Citation.] The rules governing the granting of a nonsuit, however, do not relieve the plaintiff of the burden of establishing the elements of his case. The plaintiff must therefore produce evidence which supports a logical inference in his favor and which does more than merely permit speculation or conjecture. [Citation.] If a plaintiff produces no substantial evidence of liability or proximate cause then the granting of a nonsuit is proper. [Citation.]" (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456].)

*Factual Background*

The evidence, viewed in the light most favorable to plaintiffs, established the following pertinent facts.

---

[12] *Nicole M.* was decided a mere three days prior to *Sharon P., supra,* 21 Cal.4th 1181.

The Ajanel group was intoxicated. They verbally harassed the women in the Alvarez group and aimed the video camera at them in an offensive manner. A restaurant employee observed the harassment. The women told the men in the Alvarez group about these events. The Alvarez group confronted the Ajanel group inside of the restaurant. A loud argument ensued. Victor Ajanel challenged Alvarez to a fight; Alvarez accepted. After a restaurant employee's efforts to defuse the situation met with no success, the restaurant placed a 911 call. The two groups went outside to the parking lot as did some restaurant employees.

In the parking lot, the two groups engaged in a brief pushing and shoving match. No one was hurt. As the two groups returned to the restaurant, Mauricio Ajanel made provocative remarks to Alvarez. Alvarez responded by hitting Ajanel in the face. Ajanel said, "We'll see you later," a remark also heard by a restaurant employee. The Ajanel group then left.

The Alvarez group returned to their table. When Alvarez indicated he wanted to leave, a restaurant employee assured him there would be no further problem because the police had been called.

Two police officers arrived shortly thereafter. A restaurant employee told Officer Roussett the fight was over and pointed out the Alvarez group. The employee may or may not have told the police they could leave. Officer Roussett's partner, Officer Bender, may have spoken with the Alvarez group. The police left.

Within a half-hour, the Ajanel group returned and motioned the Alvarez group to step outside. Alvarez joked about this; he and his companions ignored the Ajanel group. Mauricio Ajanel then entered the restaurant, approached the Alvarez group, and fatally shot Alvarez.

In regard to any threat by Ajanel to return to the restaurant *with a weapon*, plaintiffs' counsel conceded at oral argument that it is undisputed that neither the restaurant nor the police were apprised of that threat. Valles, a member of the Alvarez group, heard such a threat in the parking lot when the Ajanel group first left the restaurant. Although Valles told the Alvarez group about the threat, he never informed the police (whom he saw) or the restaurant employees. In addition, no member of the Alvarez group, after learning of the threat, told the restaurant employees. Lopez, a customer, also heard Mauricio Ajanel make a similar threat when his group first left the restaurant. However, Lopez did not mention it to the restaurant employees nor did he inform the police when they arrived shortly thereafter.

*Discussion*

 Given all of the above facts, we conclude the trial court properly granted nonsuit on the basis the restaurant had no duty to do anything in

addition to calling the police because the subsequent violent assault was unforeseeable.[13] At most, the restaurant knew the Ajanel group was intoxicated; the Ajanel group made offensive comments and gestures towards the women in the Alvarez group; the Ajanel group challenged the Alvarez group to a fight; the Alvarez group accepted the challenge; the two groups engaged in a pushing and shoving match in the parking lot in which no one was hurt; Alvarez punched Mauricio Ajanel after the latter made offensive remarks; and the Ajanel group left, after stating it would return *but made no threat of violence*. To the extent any duty was owed, it was met when the restaurant called the police after it was unable to defuse the escalating verbal argument. As a matter of law these facts, taken together, did not make Ajanel's subsequent return *with deadly force* and cold-blooded shooting of Alvarez foreseeable. This conclusion is not altered even were we to assume the restaurant employees did *not* tell the police about Ajanel's statement he would return. Captain Sanchez testified that statement would not qualify as a threat requiring police intervention. Absent a threat of specific imminent harm, the police would neither warn the victim(s) or seek out the perpetrators. It therefore follows that even had Guerrero told the police Ajanel had said he would be back, the police, consistent with their stated policy, would neither have remained on the premises nor advised the Alvarez group to leave. In other words, it does not make any difference whether or not Guerrero (or any other restaurant employee) told the police it was "okay" to leave or, in the alternative, told the police the Ajanel group would return. Consequently, plaintiffs' reliance on the evidentiary conflict as to what Guerrero did or did not tell the police after having called 911 is immaterial in evaluating in the dispositive issue in this particular fact pattern: Was Ajanel's use of deadly force sufficiently foreseeable so that the restaurant had a duty to protect against it?

The fact that plaintiffs established three violent incidents had occurred at the restaurant in the two and a half years prior to Alvarez's murder does not change our conclusion given their patent lack of dissimilarity to the murder. As our Supreme Court made abundantly clear in *Ann M., supra*, 6 Cal.4th 666, and *Sharon P., supra*, 21 Cal.4th 1181, the plaintiff is essentially required to establish prior similar incidents of violent crime occurred on the premises. In *Ann M.*, the court held that the prior commission of assaults and robberies did not make a rape foreseeable, and in *Sharon P.*, the court held seven bank robberies in the prior two years did not make a sexual assault foreseeable. In this matter, plaintiffs merely established that a homeless and mentally deranged individual had pointed a gun at a restaurant employee in the parking lot; that a physical struggle ensued when restaurant employees

---

[13]Contrary to what plaintiffs suggest in their brief, this analysis disposes of each individual plaintiff's claim because the commonality to each is the existence of a duty.

stopped a customer who was stealing food; and that a customer who was ejected for improper behavior threatened an employee and stated he would be back and then returned with a gun and tried to steal from the cash register. None of these incidents involved the operative facts to this case: a verbal and physical confrontation between two groups of customers; a simple statement by one group, unaccompanied by any threat of violence, that it would be back; and the return of that group with a weapon and an execution-style murder. In sum, neither singularly nor collectively do the three prior incidents render Ajanel's deadly attack on Alvarez foreseeable.

To a large extent, plaintiffs attempt to avoid the force of this conclusion by claiming that because they advanced negligence theories in addition to premises liability, a different foreseeability analysis applies. In particular, they rely upon their theory a duty was created when the restaurant voluntarily undertook to aid plaintiffs by calling the police and that the restaurant breached that duty by failing to give the police complete information about the antecedent dispute. We disagree for two reasons.

The first, and most important, reason is that it is at odds with our Supreme Court's recent decisions about the liability of a landowner for injuries caused by third party criminal acts. In *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814 [59 Cal.Rptr.2d 756, 927 P.2d 1260], the issue was whether the landowner owed a duty to cooperate with a robber to avoid increasing the risk of harm to its customers. The court reiterated that the traditional body of law governing premises liability, such as that set forth in *Ann M.*, governed the case. (*Id.* at pp. 819-820 and 822-824.) It explicitly rejected the dissent's suggestion that the relevant standard was what a reasonably prudent person would do because "in particular situations a more specific standard may be established by judicial decision, statute or ordinance." (*Id.* at p. 824.) In other words, plaintiffs cannot attempt to circumvent governing decisional law about a commercial enterprise's liability for criminal acts by recasting their claim in some other subtheory of negligence. The dispositive issue remains the foreseeability of the criminal act. Absent foreseeability of the particular criminal conduct, there is no duty to protect the plaintiff from that particular type of harm.

The second and related reason we reject plaintiffs' argument is that none of the cases they cite involves premises liability. Instead, as set forth below in footnote 14, they are merely applications of the general principle that there generally is no liability for nonfeasance but the voluntary assumption

of an undertaking creates a duty to exercise due care.[14] The circumstance that these cases are based on inapposite fact patterns only reinforces our conclusion that plaintiffs cannot make an end run around the California Supreme Court's pronouncements about premises liability by recharacterizing their claim as based upon some other theory of duty.

The analysis advanced by the dissent is not persuasive given its public policy implications. In a nutshell, the dissent would fasten liability upon a restaurant for a murder carried out by a third party because one restaurant employee did not provide information to the police which *may* have been pertinent to their deciding how to handle the situation. Guerrero (or any employee) cannot be faulted for failing to realize the significance the police would place on particular statements (i.e., the postulate we "would be coming back") or for not knowing what information the police need to determine the appropriate course of action. Guerrero made himself available to the police and spoke with them. There is no showing he intentionally withheld any information from the police or did not answer their questions.

When the police arrived at the scene, it was their responsibility to conduct an investigation adequate to address the situation. The record certainly discloses there were numerous individuals, including the Alvarez group, who had pertinent information had the police contacted them. It was not the responsibility of the restaurant or its employees to ensure all relevant information was conveyed to the police. Indeed, they cannot be presumed to know what constitutes all relevant information. To impose that responsibility would require a commercial enterprise to understand the subtleties or nuances of police procedure, an obligation supported neither by policy nor common sense.

Law enforcement is trained to investigate and prevent crime. This includes a proper investigation at the scene of an altercation such as that found in this case. To shift that burden to a pizza parlor is simply not good policy. In sum, to the extent the restaurant had any duty, it performed that duty when it called 911. To conclude otherwise impermissibly shifts the burden of effective law enforcement from the police to those who witness a problem and call for police intervention. Citizens would dial 911 at their peril.

---

[14]Plaintiffs cite *Garcia v. Superior Court* (1990) 50 Cal.3d 728 [268 Cal.Rptr. 779, 789 P.2d 960] (parole agent affirmatively represented that parolee who had threatened victim would not come looking for her); *Williams v. State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] (duty of California Highway Patrol officer to preserve evidence for civil litigation); *Boon v. Rivera* (2000) 80 Cal.App.4th 1322 [96 Cal.Rptr.2d 276] (duty of civilian to give police full information about ongoing crime).

DISPOSITION

The judgment is affirmed.

Hastings, J., concurred.

**EPSTEIN, J.,** Dissenting.—This is a wrongful death case, tried to a jury. It reaches us after defendants' motion for nonsuit was granted at the close of plaintiffs' case-in-chief. The motion was granted on the sole ground that, as a matter of law, decedent's death was unforeseeable and, hence, defendants owed no duty to the decedent. The majority's affirmance is based on that ground, and one other: that, as a matter of law, there was no causal nexus between the defendants' acts (and failure to act) and the death.

As I shall explain, I believe the trial court and the majority err in their rationale and conclusion, and that plaintiffs were entitled to reach a jury. I respectfully dissent from my colleagues' decision that they were not.

1. *Standard for Nonsuit*

It is fundamental that this case reaches us from the grant of a nonsuit motion. "A nonsuit in a jury case or a directed verdict may be granted only when disregarding conflicting evidence, giving to the plaintiffs' evidence all the value to which it is legally entitled, and indulging every legitimate inference which may be drawn from the evidence in plaintiffs' favor, it can be said that there is no evidence to support a jury verdict in their favor." (*Elmore v. American Motors Corp.* (1969) 70 Cal.2d 578, 583 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406].) The motion must be denied "if there is any substantial evidence which, with the aid of all legitimate inferences favorable to the plaintiff" tends to support a plaintiff's verdict. It also must be rejected if there is a conflict in the evidence and some evidence tends to support plaintiff's case, or when different conclusions can be reached from the evidence. If there is any doubt, the decision belongs to the jury, not to the court. (*Golceff v. Sugarman* (1950) 36 Cal.2d 152, 153 [222 P.2d 665].)

That standard informs appellate review. On appeal from a nonsuit judgment, we consider the evidence in the light most favorable to the plaintiff and draw all inferences that can reasonably be drawn in plaintiff's favor. (*Golceff v. Sugarman, supra,* 36 Cal.2d at p. 153.) "Only if, after indulging every legitimate inference favorable to plaintiffs, we find that there is no evidence of sufficient substantiality to support a verdict in plaintiffs' favor, can we uphold the judgment of nonsuit." (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 699 [106 Cal.Rptr. 1, 505 P.2d 193]; see

also *Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118 [184 Cal.Rptr. 891, 649 P.2d 224, 35 A.L.R.4th 1036] [court may not weigh evidence or consider witness credibility in ruling on nonsuit motion]; *Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656] [all inferences and presumptions resolved in favor of plaintiff]; *Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1328 [96 Cal.Rptr.2d 364] [motion has effect of demurrer to the evidence].) "Because a grant of the motion serves to take a case from the jury's consideration, courts traditionally have taken a very restrictive view of the circumstances under which nonsuit is proper." (*Campbell v. General Motors Corp., supra,* 32 Cal.3d at p. 117.)

These are exacting standards. They are not satisfied in this case.

2. *Evidence Presented and Not Presented During Plaintiffs' Case-in-Chief*

The majority's opinion recounts evidence presented at trial, and there is no need to repeat what it says. Some important facts are omitted, however, especially from the "pertinent facts" portion of the opinion, in which the majority states that it summarizes the evidence "in the light most favorable to plaintiffs." The summary presents some facts in a light that is something less than most favorable to the plaintiffs. I turn to a discussion of these facts and the omitted evidence.

After the Ajanel group harassed the women of the Alvarez group, it was Carlos Alvarez who confronted them. He and Victor Ajanel (the person who had done the offensive videotaping) were screaming at each other. Ajanel called Alvarez "a stupid Salvadorian" while he (Victor) came from Guatemala and could do whatever he wanted. "Salvadorians were nothing" according to him. After the two groups returned to the restaurant from their physical encounter in the parking lot, and after Mauricio Ajanel further insulted the Alvarez women, Carlos not only punched him in the face; he gave him a bloody nose. As one witness put it, "he had his nose busted and he was bleeding."

It was then that the Ajanel group left. While there was evidence that on leaving they said, "We'll see you later," there also was evidence that their departing statement was more ominous: they "would be coming back." It is the latter version that we must accept for purposes of this review.

After the Ajanels left and the Alvarez group returned to their table, Carlos said not only that he wanted to leave, but why he wanted to do so. The reason was that "he didn't feel safe." He repeated his desire to leave to a

restaurant employee, who told him (as the majority opinion accurately relates) that everything was going to be taken care of, that there was no problem, and that everything was going to be fine. The food service arrangement at Shakey's apparently was one in which the customer places an order and is called to a counter when the food is ready to be picked up. The restaurant employee who had just assured Carlos, in essence, that it was safe to stay, picked up the food and took it to the Alvarez table. The Alvarez party then stayed.

Los Angeles Police Department Officers Roussett and Bender responded to the 911 call that restaurant employee Guerrero had placed when things began to escalate during the initial Alvarez confrontation. Only four minutes elapsed from the time they pulled into the restaurant parking lot until they left. Officer Roussett talked to Guerrero, who acted as spokesperson for the restaurant. Their conversation lasted only one minute. While there was some evidence that Officer Bender was at the Alvarez table, there also was evidence that he was not and that he never spoke to anyone in the Alvarez party. There was evidence that one of the members of the Alvarez group tried to get the officers' attention, but was unsuccessful. As one of the witnesses put it, "they [the officers] went in, talked to the manager and that was it."

In his brief conversation with Officer Roussett, Guerrero told him that the fight had "dispersed" and, as the majority opinion recounts, that it was okay for them to leave. According to Officer Roussett, Guerrero did *not* tell him that the Alvarez group was still at the restaurant. And, as everyone acknowledges, he told them nothing about the Ajanels' stated intention to return.

The majority characterizes the testimony of police Captain Ronald Sanchez to be that, even if police had been told of the Ajanels' statement that they would return, "the police, consistent with their stated policy, would neither have remained on the premises nor advised the Alvarez group to leave" because the statement about coming back "would not qualify as a threat requiring police intervention." (Maj. opn., *ante*, at p. 1211.) That is not what the officer said.

Captain Sanchez, then a lieutenant, was in charge of the detail that investigated the crime scene after Carlos Alvarez was killed. He was questioned as an expert on direct examination by plaintiffs' counsel, and on cross-examination. These questions focused on what Los Angeles police officers do when there is a threat to another person. According to Captain Sanchez, "if we become aware that there's a threat on an individual, then the Department has an obligation to warn the individual."

Several questions were asked of Captain Sanchez about how the department handles terrorist threats, and he answered other more general questions in terms of the terrorist threat situation. It is clear from his testimony that, in referring to terrorist threats, he was referring to the crime known by that name: Penal Code section 422. As Captain Sanchez understood it, a contingent threat does not qualify as a terrorist threat. He offered an example: "[I]f you don't do this, I'm going to hurt you or I'm going to kill you" is a contingent statement and not sufficient to generate a crime report and other police action. (Actually, even a contingent threat may qualify under the statute, depending on the circumstances; see *People v. Bolin* (1998) 18 Cal.4th 297, 338 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Captain Sanchez spoke of circumstances in which the department would assign a protective detail to the threatened person, and said that if officers thought the threat was immediate, they would do more than walk the person to his car. "If we think that somebody is coming back in a few minutes to do a crime, then we would protect that individual until we could get them to leave the location." And again, if police had "specific, verifiable information that someone is en route to harm somebody, then . . . we would . . . do everything within our course and power at that time, to get that person away from the scene." Specifically, "if there was a threat made that somebody was going to come back and do great bodily harm" to a person, police would approach the person and suggest that he leave, and if he agreed, they would help him to get out of harm's way unless he refused such assistance.

Captain Sanchez testified that officers are expected to exercise common sense in these cases.

The final question asked of Captain Sanchez on direct examination was this: "Now, from a situation that involved two groups fighting between each other, and after the fight was over, one person that got angered said something like, 'I'll see you later,' or 'we'll see who laughs last.' Would that be considered by you to be a *terrorist threat*?" (Italics added.) Understandably, the answer to this question was "no."

The final and convoluted question to Captain Sanchez on cross-examination asked him to assume "a fight occurred at the Shakey's on the evening of May 11th, between two groups. The Los Angeles Police Department was called near the end of that fight occurring; that one member of the group— one of the groups was hit in the face or nose and was bleeding; that some people might have heard this person say words like, 'I'll see you later.' Or words to that effect; that when the police arrived, at the Shakey's, there was no fight in the parking lot, no evidence of a fight, that is to say, everything looked like it was normal at the Shakey's. . . . [¶] . . . And the police

came, spoke to a restaurant employee and also spoke to the group that was one of the groups involved in the original fight . . . ." With all of those assumptions crammed into the officer's recollection, counsel finally arrived at the question: "Based upon those facts, did the Los Angeles Police Department officers act reasonably in coming to the restaurant and talking to a restaurant employee and members of a group that was involved in the fight, to learn about what had occurred?" The answer, of course, was "Yes."

It is notable that Captain Sanchez was *not* asked whether the officers should have done more than was supposed in the question. Captain Sanchez was only asked whether talking to the manager and speaking to one of the groups involved in the fight was reasonable in order to find out what happened. Of course, it was reasonable.

This is not evidence that, had the officers been informed of what happened, and particularly of the threat of the Ajanel group to come back, they would have simply left the premises without suggesting to the Alvarez group (assuming they knew that group was still there) that it leave. As I shall discuss, it is reasonable to infer that, using common sense, as Captain Sanchez testified officers are expected to do, they would have warned the Alvarez party to leave.

Captain Sanchez was not the only officer to testify as an expert. Officer Roussett also testified to police practices. The questions, asked by plaintiffs' counsel, went to what he would have done if he had been informed that "one of the persons involved in the group fight indicated his intention to come back to the restaurant, possibly with a weapon, to do harm to another person that he had been fighting with previously." He answered that he would have called for backup, taken a crime report, and advised the victim to leave. The problem with this question is that there was no evidence that Guerrero had heard that anyone in the Ajanel group had said he was going to return with a weapon. Nevertheless, the answer indicates the commonsense attitude of police officers when informed of imminent danger to a citizen: they would at least warn the citizens to get out of harm's way. There was no such warning in this case.

3. *Foreseeability*

The trial judge focused on foreseeability, relying principally on the Supreme Court's decision in *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181 [91 Cal.Rptr.2d 35, 989 P.2d 121]. He accepted that the state of the evidence showed that the assailant had been given a bloody nose in a fight with Carlos Alvarez, that the Ajanel party had left vowing to come back, and that the

responding officers had not been told of that stated intent. In the trial court's view, even assuming the omission played a role in the ultimate result, it "does not, in these circumstances, bridge the breathtaking gulf in legal nexus between pushing, shoving and a bloody nose on the one hand and cold-blooded murder on the other." Because of the lack of foreseeability, the court reasoned, the harm was not within the scope of legal duty owed by defendants to plaintiffs. The majority accepts that analysis.

In essence, the trial court and the majority focus on whether a murder was foreseeable from what happened in the restaurant. That is not the proper focus. The court's task in analyzing the foreseeability aspect of duty "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed on the negligent party." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; see also *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1030 [47 Cal.Rptr.2d 348]; *Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th at pp. 1205, 1206 (dis. opn. of Mosk, J.).) That question involves a number of factors not discussed by the trial court or treated by the majority.[1]

Instead, their focus seems to be on what a trier of fact might reasonably foresee in the context of the circumstances of this case. That is a jury question unless the plaintiffs' evidence is so weak that no reasonable jury could conclude that violent physical harm was in the offing from what had transpired.

Before treating that question, some discussion is necessary about the cases cited by the majority with respect to the duty of a land possessor to a business invitee with respect to the risk of a criminal act by a third party. The majority discusses *Sharon P.* as well as one other Supreme Court case, *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666 [25 Cal.Rptr.2d 137, 863 P.2d 207], and a Court of Appeal decision, *Nicole M. v. Sears, Roebuck & Co.* (1999) 76 Cal.App.4th 1238 [90 Cal.Rptr.2d 922]. All

---

[1] At the concluding portion of its opinion, the majority respond to the analysis in this dissent. The majority discusses the duty of the restaurant, through its spokesperson, to provide information to police. That issue was not explicated in briefing or argument to the trial court or to this court. At its perimeters it raises significant issues of duty analysis. But in this case, we are not dealing with the perimeters of what the restaurant's spokesperson ought to do. What he actually did went beyond failing to impart full details of the episode to the officers who responded to the 911 call. He provided them with no information. Instead, he effectively sent them off, telling them that the problem was over when, according to plaintiffs' evidence, he knew that it was not.

of these cases recognize that a premises possessor owes a duty of care to business invitees; their situation is not the same as a stranger who chooses not to come to the aid of a stranger in peril.

Thus, in *Ann M.* the court recognized the duty of landowners to maintain property under their possession and control in a reasonably safe condition, a duty that includes the obligation to take reasonable steps to secure common areas against foreseeable criminal acts that are likely to occur absent such precautionary measures. The court cited Civil Code section 1714 and a classic case, *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 499 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447], for this proposition. (*Ann M. v. Pacific Plaza Shopping Center, supra,* 6 Cal.4th at p. 674.) *Sharon P.* includes a similar analysis. (*Sharon P. v. Arman, Ltd., supra,* 21 Cal.4th at p. 1189.) But the court held that a duty to take affirmative action to control wrongful acts of a third party will be imposed only where those acts can be reasonably anticipated. (*Ann M. v. Pacific Plaza Shopping Center, supra,* at p. 676; *Sharon P. v. Arman, Ltd., supra,* at p. 1189.) Neither case held that a premises possessor owes no duty to an employee or a customer to guard against possible criminal activity by third parties. A balancing is required, of the burden of taking steps to guard against such activity and the likely efficacy of steps that can be taken, compared to the likelihood that the criminal activity will occur. (*Ann M., supra,* at p. 678.) "[A]bsent any prior similar incidents or other indications of a reasonably foreseeable risk of violent criminal assaults" at the particular location, the court concluded, "we cannot conclude defendants were required to secure the area against such crime." (*Sharon P., supra,* 21 Cal.4th at p. 1199; see also *Kentucky Fried Chicken of Cal., Inc. v. Superior Court* (1997) 14 Cal.4th 814 [59 Cal.Rptr.2d 756, 927 P.2d 1260] and Rest.2d Torts, § 344 [general duty of possessors of premises open to the public; com. f, explaining that premises possessor is not an insurer of visitor safety].)

Like *Ann M.* and *Sharon P.*, the *Nicole M.* case involved a sexual assault on the defendant's premises. Since there had been no previous similar attacks at the business location, the premises possessor could not have reasonably anticipated the crime and was under no duty to prevent it.

In each of these cases, the court was concerned with the foreseeability of criminal conduct by an unknown and unknowable possible assailant. That is in sharp contrast with this case. The identity of the assailant in this case was precisely known. It is as though, in any of the Supreme Court cases, the premises possessor had received specific reliable information that a particular assailant would be at the property to attack persons there, yet took no steps to prevent the attack. This distinction is pointed up in *Saelzler v.*

*Advanced Group 400* (2001) 25 Cal.4th 763, 776 [107 Cal.Rptr.2d 617, 23 P.3d 1143], a causation case. There the court contrasted the unknown assailant scenario with the case of a known anticipated attacker. It cited *Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1238 [32 Cal.Rptr.2d 136], in which a plaintiff was attacked and severely injured by a disgruntled and recently terminated employee, where the employer was fully aware of the danger posed by the former employee and had employed a security firm to protect its employees. The security company ignored the danger and failed to keep the former employee off the property. The appellate court rejected the argument that the guard company could not have kept the former employee off the premises, and hence did not cause the injuries that were inflicted when he appeared.

Here, the identity of the attacker was well known: it was the Ajanel party, and particularly Mauricio Ajanel, the man who had received a bloody nose at the hand of Carlos Alvarez. The group left vowing to return, and it did.

4. *Threat*

The majority concludes that, as a matter of law, the facts of the case "did not make Ajanel's subsequent return *with deadly force* and cold-blooded shooting of Alvarez foreseeable." (Maj. opn., *ante*, at p. 1211.) As has been discussed, whether the "cold-blooded murder" of Carlos Alvarez was foreseeable is not the question; it would be enough if it was foreseeable that the Ajanel group would return bent on a violent assault on Carlos or his group. It is difficult to see how anything else could have been foreseen if plaintiffs' evidence is credited. Mauricio had been severely "disrespected" in a public setting: at a restaurant, in the presence of customers and employees. He had insulted the Alvarez women, and had been bloodied by a blow from Carlos Alvarez in return. He and his group then left, saying they would be back. Why were they leaving? Why would they come back?

Assuming they meant what they said, a reasonable inference under the circumstances is, the only reason for them to leave and return was to get more manpower (there were three Ajanel men and four men in the Alvarez group), or more weapon power, or both. Certainly, they were not coming back to toast Carlos's health. Of course, it is possible that someone hearing and seeing the whole episode would have thought they were bluffing, or that they would change their mind about returning. But those speculative possibilities are matters for the trier of fact to decide. It cannot be said on this record that, under all the circumstances and indulging every reasonable inference in favor of plaintiffs, the return with violent results was not

foreseeable. In today's violent urban setting, it was only too foreseeable, as attested by the stream of this kind of case coming before our court and others.

Against this, what was the defendants' burden? Even if we were to remove the incident from the commercial setting where it occurred and posit it in the context of the duty of a stranger, where there is no obligation to come to the aid of another, there is an obligation not to induce reliance on the part of a person who needs help, and not to make the situation worse. (See Rest.2d Torts, § 323.) Defendants did both. Their employee assured Carlos Alvarez that there was no danger, when there was. And their spokesperson failed to inform the responding officers of the circumstances that presented a danger: that one of the Ajanel party was struck by one of the Alvarez party and had suffered a bloody nose, that the group had left saying they would return, and that the Alvarez party had not left but was still in the restaurant.

## 5. *Causation*

The majority takes the position telling the officers the Ajanels had said they were coming back would have made no difference. That is because, under police policy, the officers would not have advised the Alvarez party to leave. As I have discussed, no police officer stated that was police policy. Captain Sanchez's statements indicate that if the officers had known that the Ajanels planned to return under circumstances where further violence might be anticipated, they would have taken some action to prevent violence, at least by advising the Alvarez group to leave. Carlos Alvarez wanted to leave because he was afraid of staying. But he had been assured by a restaurant employee that there was nothing to worry about.

At the very least, the officers' testimony fails to establish that the responding officers would not have, or should not have, warned the Alvarez party to leave had they known the group was still at the restaurant, that one of the Ajanel group had been bloodied, and that, on leaving, the group had said they were coming back. Commonsense, and the expectation that police officers will apply it, make it likely that the responding officers would have warned the Alvarez party to leave, and that the warning would have been heeded.

Of course, they might not have left; and the officers might not have warned them; and one of the officers might have actually talked to the Alvarez group; and perhaps all the Ajanels said was something on the order

of "see ya," with no sinister connotation. There are other possibilities as well, and the case is full of credibility issues. But all these things were for the jury to decide. Plaintiffs were entitled to have it do so. It was error to deprive them of that right by nonsuit. We should reverse.