Filed 8/18/20 Obi v. Los Angeles County Sheriff's etc. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| MARCEL OBI,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT et al.,<br><br>    Defendants and Respondents. | B296553<br>(c/w B302219)<br><br>(Los Angeles County Super. Ct. No. BC650099) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County. Lia R. Martin, Judge. Affirmed.

Mahoney Law Group, Anna Salusky Mahoney, Kevin Mahoney and Joshua D. Klein for Plaintiff and Appellant.

Gutierrez, Preciado & House, Calvin House and Nohemi Gutierrez Ferguson for Defendants and Respondents.

_____

In this employment case based on a host of allegations, including race and national origin discrimination, retaliation, and intentional infliction of emotional distress (IIED), defendants Los Angeles County Sheriff's Department (Department), Weng Chua (Chua), and Steve Huynh (Huynh) (collectively respondents) obtained summary judgment against plaintiff Dr. Marcel Obi (Obi) based on the trial court's conclusion that: (1) there was no evidence that Obi suffered any actionable adverse employment action; and (2) even if there were adverse employment action that would otherwise be actionable, there was no connection to "any sort of racial animus or national origin animus." Subsequently, the trial court awarded respondents $13,191.95 in costs.

Obi separately appealed from the judgment and the award of costs. By order, the appeals were consolidated. We find no error and affirm in all respects.

## FACTS

### Background

Obi started working for the Department in 2000 as an Information Systems Analyst II. In 2009, the Department promoted him to Information Systems Supervisor II and he supervised employees working in Web development.[1] Obi had a private office.

From November 27, 2012, through December 31, 2014, Stuart Suede (Suede) supervised Obi in the Data Systems Bureau Data Center Administration Unit (Administration Unit). During the time Suede supervised Obi, the Administration Unit

---

[1] While the record indicates that Obi supervised multiple employees, it does not indicate the number.

oversaw the buildout project for the Data Center of the Sheriff Communications Center Building (SCC).  Suede was the project manager.

From 2012 until he retired in 2018, Captain Paul E. Drake oversaw the Data Systems Bureau.

In 2013, Chua became Obi's second-level supervisor.  On August 21, 2014, Chua provided Obi with his 2013-2014 Performance Evaluation and rated him "Very Good" overall based on his performance.  At some point, Huynh became Obi's first-level supervisor.

In 2014, Obi was reclassified and then reassigned to a new position.  He claims that this initiated ongoing discrimination and other torts that were perpetrated mainly by Chua and Huynh and that, as a result, he suffered a series of adverse employment actions.  He sued.

**The Operative Complaint**

After Obi sued respondents, he eventually filed a second amended complaint (SAC) which alleged the following causes of action:  (1) racial discrimination; (2) national origin discrimination; (3) racial harassment; (4) national origin harassment; (5) failure to prevent harassment and discrimination; (6) negligent hiring, supervision, and retention; (7) hostile work environment; (8) retaliation; (9) IIED; and (10) retaliation in violation of Labor Code section 1102.5. Relevant to his qualifications and background, he alleged that he has a computer science Ph.D. in information systems, and he is an African-American who is of Nigerian descent.  As for the events leading to his claims, he alleged:  He was reclassified in 2014 to a different supervisory position and then reassigned.  His new job duties—which included managing generators, air

3

conditioning units, etc.—were unrelated to his previous job duties and experience in Web development.  He made multiple requests for training in these new areas but his requests were denied.  In contrast, other supervisors who were reassigned to new positions were provided with job-related training.  Over the ensuing years, inter alia, the Department gave Obi negative evaluations, treated him differently than other supervisors, excluded him from necessary training, transferred him from Norwalk to the SCC, assigned him an unreasonable amount of work, threatened him with demotion or discharge, and retaliated against him for complaining about discrimination.  Many of these actions were taken by Chua and/or Huynh as managing agents of the Department, and the Department's actions were taken because of Obi's race and national origin.

**The Motion for Summary Judgment; the Evidence**

Respondents moved for summary judgment or, in the alternative, summary adjudication.  The parties submitted evidence related to the following topics.

*Job Reassignment Obi Claims was Adverse Employment Action*

The Department decided to consolidate all information technology resources under the Data Systems Bureau.  The consolidation resulted in the reclassification of employee titles.  Prior to reclassification, Huynh and Obi both held the title of Information Systems Supervisor II.  The top end of the monthly salary range was $9,241.00.  Initially, Huynh was reclassified to Principal Operations Systems Analyst (POSA) but Obi was reclassified to Principle Information Systems Analyst (PISA).  Obi considered this a demotion.  Moreover, the top end of the monthly salary range for a PISA was $9,128.18, less than for an

4

Information Systems Supervisor II, so Obi believed that he would be paid less.[2]

Obi asked Captain Drake and Suede to reclassify him as a POSA, the same as Huynh. Per an e-mail to Obi from Suede, "the reclass[ification] list was assembled by [Data Systems Bureau] Operations, and vetted/approved by Captain Drake." Captain Drake reclassified Obi to POSA, which resulted in an increase in his compensation. He sent an e-mail to Captain Drake and others stating, "I would . . . like to officially thank the Captain for finding the mistake and revising his earlier decision." As a POSA, Obi was responsible for infrastructure, such as generators, air conditioning, electricity/power supplies, floor tiling and cleaning. Captain Drake knew that Obi's background was in computers and software, and that he did not have an electrical engineering background.

*Transfer Obi Claims was Adverse Employment Action*

On March 7, 2016, the Department transferred Obi from the Norwalk Data Center to the SCC. Initially, Obi was the only employee there. The October 11, 2017, Administration Unit organization chart listed Sam Hallie (Hallie) and Chris Chiu (Chiu) as employees under Obi' supervision. Eventually, Chiu was stationed at the SCC. On that same organization chart, Kaiser Den was the only other POSA, and nine employees were listed as being under his supervision.

---

[2] At his deposition, Obi was asked whether he knew that county policy would allow him to keep his current rate of pay despite the reclassification to PISA. He replied, "It's possible," and acknowledged that he did not ask the Department if he could keep his same rate of pay.

*Workspace Conditions at the SCC Obi Claims were Adverse Employment Actions*

The SCC has no offices, so Obi was not given one.[3]  He worked in a room with a C-shaped bench and had to use a conference room to discuss performance evaluations with his subordinates.

When Obi arrived at the SCC, cameras had been installed in the facility.  Hallie, however, later installed a new camera near the employee work station.[4]

*E-mails Obi Claims were Adverse Employment Actions*

In September 2014, Captain Drake e-mailed Obi:  "I expect you to [rise] to the occasion of your newly classified position.  If we determine that you [cannot] operate at this level, I will begin the process to remove you.  I expect a great deal from my assigned principles.  Your career path is only defined by you.  If

---

[3]     Huynh declared, "Kaiser Den is a [POSA], which is [Obi's] job classification.  Mr. Den is neither Nigerian nor black (African-American) and functions without an office at the Norwalk facility.  The following 15 Data Service Bureau supervisors or above are neither Nigerian nor black, and do not have an office:  Mao Sok, Ramon Sanonte, Jr., Chi Lam, Amir Hami, Justin Jereza, Thang Uong, Romy Calderon, Daniel Cheng (recently retired), Areg Sarkissian, Don Dizon, Sgt. Enrique Mandujan, Sochithra Thach, Hua-Gon (Leo) Change, Christian Hai, and Angela Vargas."  Below, Obi contended this information was misleading because Kaiser Den and others have cubicles, and many of the others have a lower job classification than Obi, such as PISA.

[4]     Huynh said the camera was pointed toward the entry, not in the direction of Obi's desk.  Obi declared, "On September 7, 2017, [Huynh] directed the newly-installed camera to capture the movements of myself and my subordinate, Chris Chiu, as we walked around the SCC."

6

you cannot [*sic*] [rise] to the occasion you will be replaced.  [¶] Good Luck!"

In November 2014, via e-mail, a sergeant asked Chua, Huynh, Suede, Obi and Hallie whether Watch Commanders "working the bridge at [the SCC]" could monitor room temperatures.  Suede told Obi to respond to the sergeant, and Obi asked Suede whether there was "a thermometer there before construction[.]"  Suede replied:  "[Y]ou should know that before construction is immaterial to [the sergeant's] inquiry.  There is a thermometer in the CAD room[.]  [T]he SCC [B]ridge [*sic*] will take hourly walks in the [D]ata [C]enter to monitor temperature and we concur that all personnel on the SCC Bridge will have biometric access into the Data Center[.]"  In response, Obi defended the question he asked and wrote, in part, "The most disturbing fact is that you humiliate me in front [of] my subordinates[.]  [F]or today it was [Hallie], which is one of the reasons he has no respect for me[.]"  Obi ended his e-mail by stating:  "I just hope you realize you are constantly harassing me in many fronts and put a stop to it."

*Performance Log Entries Obi Claims were Adverse Employment Actions*

When a manager seeks to correct an employee, the manager issues a Performance Log Entry (Log Entry).  A Log Entry can be used to reprimand employees, and it can be used to discipline them.  They are reviewed annually before employee evaluations are written.  After a year, a Log Entry is thrown away.

On March 12, 2015, Chua issued a Log Entry to Obi and informed him:  "You are a supervisor assigned to assist with the infrastructure project at the SCC Data Center.  On January 7,

7

2015, Supervisor [Huynh] sent you an e-mail that informed you that there were lots of items on the SCC Data Center task list that haven't been updated and/or need follow up on. He requested that you let he and I . . . know when the spread sheet was updated and to complete any of the tasks that are on the list and tasks that are not yet on the list. On March 12, 2015, after Supervisor Huynh requested you take over this entire project, I reviewed your progress on what was requested of you back on January 7, 2015 and discovered little to no progress on completing task items and/or following up on task items. This is a violation of MPP 3-01/050.10 Performance to Standards and 3-01/030.10 Obedience to Laws, Regulations, and Orders. Any further violations expose you to discipline, including and up to demotion and/or discharge."

Between March 2015 and July 2017, Obi received approximately 40 Log Entries from Chua and Huynh. The Log Entries warned Obi that further violations would expose him to discipline; "demotion and/or discharge;" "Departmental action;" and/or "further administrative action."

At one point, Chua issued a Log Entry because Obi failed to send e-mails, something Chua had never done for another employee. Lieutenant Brian Yanagi testified that it is uncommon to create a Log Entry "for an employee missing an e-mail with a task[.]" In general, he testified that he has never seen an employee with so many Log Entries and acknowledged that receiving that amount may be "stressful" and "can seem punitive" even though "the idea is to afford the employee the information necessary to make the adjustments to meet expectations."

Chua and Huynh have never given 30 or more Log Entries to another employee. Since March 25, 2015, Huynh did not issue

8

a Log Entry to anyone other than Obi. From 2007 to March 2015, Chua issued only two Log Entries to subordinates for missing tasks.

*Performance Expectation Plans Obi Claims were Adverse Employment Actions*

If a Log Entry does not result in improved performance, the Department will proceed with a Performance Expectation Plan (Expectation Plan).

On March 25, 2015, Chua issued an Expectation Plan and informed Obi he could not delegate tasks to subordinates without approval from Huynh or Chua.[5] Lieutenant Yanagi never saw this instruction given to another employee. Pursuant to the Expectation Plan, Obi was supposed to be evaluated on a weekly basis. Obi was the only employee that Chua and Huynh ever subjected to weekly monitoring, and the only supervisor ever instructed to seek permission before delegating tasks to subordinates. Chua did not issue an Expectation Plan to anyone other than Obi. Since March 25, 2015, Huynh did not give an Expectation Plan to anyone other than Obi.

On February 14, 2017, Obi received an Expectation Plan that threatened him with discipline if he failed to perform.

*Daily Logs Obi Claims were Adverse Employment Actions*

In March 2015, Huynh started keeping daily logs relating to Obi. The comments were mostly negative with less than 10 percent being positive. Huynh kept logs for two other

---

[5] Obi says the Expectation Plan contains "numerous, onerous restrictions" that made the Expectation Plan unfair and unattainable but does not identify what he considers numerous, onerous restrictions other than his inability to freely delegate work.

9

employees and, as to them, only made negative comments once or twice per year. From April 3, 2015, to April 22, 2015, Chua documented Obi's daily activities, something Chua had never done with another employee.

*The Assignment Obi Claims was an Adverse Employment Action*

Huynh assigned Obi as the project manager and technical supervisor for the implementation of a new Microsoft HyperV cluster (HyperV).[6] Huynh and Chua estimated that it would take three uninterrupted weeks for Obi to complete. However, Huynh gave Obi three months. He refused to attend HyperV meetings, claiming that they constituted harassment and the project was fake. On November 22, 2017, Huynh notified Obi he was being removed from the project.

*Level of Training Obi Claims was an Adverse Employment Action*

In April 2014, Obi attended training for computer room air conditioning equipment. From September 26, 2016, to September 30, 2016, Obi attended training for the HyperV project.

"Supervisors that were placed into a new position [because] of the reclassification study did not receive training as the result of the change in title. . . . Nonetheless, [Obi] was offered various trainings after his position was reclassified." At one point, Obi went to the Uninterrupted Power Supply training. But he declared that the "training was intended for individuals with an

---

[6] Obi contends that the project required at least 10 people but he was the only person assigned to it. His record citations do not support his contention.

electrical engineering background.  I was only present as an observer, as I do not have a background in electrical engineering."  In his deposition, Obi indicated he did not want to participate in the HyperV project because he was not given "appropriate training."

*Other Events Obi Claims were Adverse Employment Actions Because they Undermined Him as a Supervisor*

When Obi wrote a Log Entry for a subordinate who did not complete a task, Chua and Huynh objected.  A subordinate named Lynne Gipson (Gipson) was present at a meeting where a Log Entry for Obi was discussed, and then Gipson typed it up and signed it along with other participants.  In March 25, 2015, Huynh, Chua, Lieutenant Yanagi and Gipson met with Obi and discussed his three-month performance expectations with him.

*Certain Evidence Cited by Obi to Prove Discriminatory or Retaliatory Motivation for the Employment Actions*

Obi is the only supervisor at the Data Systems Bureau who is Nigerian and/or Black.

One day in 2014 or 2015 when Obi walked into Chua's office for a meeting, he overhead Huynh say, "Because [Obi] has a Ph.D., he thinks he can rule the world," and Chua replied, "He wants everything[.]  [W]hat does he get from his country[?]"  When Obi entered, Chua and Huynh stopped laughing and talking.  Per Obi, this event happened around the same time that he was asking for training and to get his private office back.

**The Trial Court's Ruling; Judgment**

The trial court granted the summary judgment motion because, inter alia, respondents did not take adverse employment action against Obi and, regardless, there was no connection between the Department's various actions and racial and/or

11

national origin animus. Subsequently, the trial court entered judgment.

Obi appealed.

**The Cost Award**

On March 25, 2019, respondents served a memorandum of costs seeking $15,423.06. In response, Obi filed a motion to tax $2,231.11 in costs for court reporter fees for transcripts not ordered by the trial court, photocopies for deposition exhibits, and requests for medical records. Respondents filed a motion for $629,688.06 in attorney fees and costs under Government Code section 12965, subdivision (b), claiming the California Fair Employment and Housing Act (FEHA) claims were frivolous. Also, they filed a nonopposition to the motion to tax costs and agreed to have them reduced to $13,191.95. Obi opposed the motion for attorney fees and costs. As for the costs, he noted that he previously filed a motion to tax costs and offered no new argument. On June 27, 2019, the trial court denied the requested attorney fees based on a finding that the FEHA claims were not frivolous. But it noted that there were nonFEHA related claims and then stated that respondents' costs would be determined at the hearing on the motion to tax.

On September 24, 2019, in a reply in support of his motion to tax costs, Obi asked the trial court to strike all costs based on its previous finding that the action was not frivolous. In the alternative, it asked the trial court to award only those costs that could be allocated to the nonFEHA related claims. Respondents filed a sur-reply and argued that Obi's effort to tax all the costs was late because the reply was not served and filed within 15 days after service of the cost memorandum. They also pointed out that Obi had nonFEHA related claims.

12

The trial court granted the motion to tax $2,231.11 in costs. Regarding all other costs, the trial court noted that in the three months after it denied attorney fees, "[Obi] neither request[ed] leave to amend the memorandum of points and authorities in support of [his] motion [and] raise [a new] argument nor notified [respondents] that he was withdrawing from the stipulation. . . . [Obi] has waived and is estopped from raising [a new] argument by his conduct."[7]

Obi appealed.

## DISCUSSION

Obi contends: (1) the trial court abused its discretion when ruling on evidentiary objections; and (2) there are triable issues as to the first, second, fifth, eighth, ninth and tenth causes of action because the Department engaged in actionable adverse employment actions against him due to his race and national origin. We disagree.

## I. Standard of review.

Our review of an order granting summary judgment is de novo. (*Garrett v. Howmedica Ostenics Corp.* (2013) 214 Cal.App.4th 173, 181.) In contrast, we review evidentiary rulings related to summary judgment motions for an abuse of discretion. (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226.)

When determining whether summary judgment was correct, "we follow the traditional three-step analysis. 'We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which

---

[7]     There was no stipulation between the parties.

13

negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue. [Citation.]'" (*Shamsian v. Atlantic Richfield Co.* (2003) 107 Cal.App.4th 967, 975.)

Generally, an award of costs will not be reversed except for an abuse of discretion. (*Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, 519.) But whether an award of costs is authorized is a question of law subject to de novo review. (*Bustos v. Wells Fargo Bank, N.A.* (2019) 39 Cal.App.5th 369, 375.) In contrast to the foregoing, waiver and estoppel are questions of fact that are reviewed pursuant to the substantial evidence test. (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1053; *Attard v. Board of Supervisors of Contra Costa County* (2017) 14 Cal.App.5th 1066, 1080.)

Even if there is error, we will not reverse a judgment or order unless we find a prejudicial miscarriage of justice. A miscarriage of justice will not be found unless it is reasonably probable that, absent the error, the appellant would have obtained a more favorable result. (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 822–823.)

## II. Evidentiary objections.

Though Obi identifies the first issue on appeal as "whether the trial court abused its discretion in sustaining the Department's objections to certain evidentiary matters," neither the discussion section in his opening brief nor the one in his reply brief contain a heading or subheading or any discussion pertaining to this topic.

14

In the opening brief, Obi sets forth the standard of review for evidentiary rulings in summary judgment proceedings and then, in a footnote, states, "The specific evidentiary rulings that [Obi] challenges on appeal are discussed within the facts and will not be repeated."

A review of the statement of facts reveals that there are two footnotes which argue that the trial court abused its discretion when it sustained objections to paragraphs 7 and 8 of Obi's declaration. While Obi provides record citations to the Department's objections as well as the rulings and then offers ipse dixit argument that the trial court committed error, he does not provide any legal citations or otherwise attempt to apply the relevant law to the facts. We conclude that Obi waived his arguments for multiple reasons. First, every brief must state "each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B); *Heavenly Valley v. El Dorado County Bd. of Equalization* (2000) 84 Cal.App.4th 1323, 1345, fn. 17.) Second, "[i]t is not our responsibility to develop an appellant's argument." (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11.) Third, respondents did not discuss the evidentiary rulings and it would be unfair to them to consider those rulings when Obi did not present them in the proper fashion. Fourth, Obi does not explain how he was prejudiced by these rulings.

15

**III. First and Second Causes of Action for Race and National Origin Discrimination Under the FEHA; Eighth Cause of Action for Retaliation Under the FEHA; Tenth Cause of Action for Retaliation in Violation of Labor Code Section 1102.5.**

    A. <u>Legal Principles</u>.

        1. *Discrimination*.

Under the FEHA, it is unlawful for an employer to discriminate against a person in the terms, conditions, or privileges of employment, because of race or national origin. (Gov. Code, § 12940, subd. (a).) Typically, the plaintiff in an employment discrimination case based on disparate treatment relies on circumstantial evidence. In such instances, there is a three-stage burden-shifting test. (*Guz v. Bechtel National Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) As a threshold matter, the plaintiff must prove a prima facie case of discrimination. (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1751.) If the plaintiff does so, the burden shifts to the defendant to proffer a nondiscriminatory reason for its action. (*Ibid.*) If that burden is met, the plaintiff must show by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination.[8] (*Id.* at pp. 1749, 1750.) With respect to summary judgment motions by employers, this framework is reordered under our case law. (*Kelly v. Stamps.com Inc.* (2005) 135 Cal.App.4th 1088, 1097.) An employer must show "either that one or more elements of the prima facie case 'is lacking, or

---

[8]    The parties argue whether the Department's reasons for its action were a pretext. Because the trial court did not reach that issue, we decline to consider it.

that the adverse employment action was based on legitimate nondiscriminatory factors.' [Citations.] [If] the employer [succeeds], the burden shifts to the plaintiff to produce "'substantial responsive evidence" that the employer's showing was untrue or pretextual.' [Citations.]" (*Soria v. Univision Radio Los Angeles, Inc.* (2016) 5 Cal.App.5th 570, 591–592.)

"The specific elements of a prima facie case may vary depending on the particular facts." (*Guz*, *supra*, 24 Cal.4th at p. 355.) Generally, a prima facie case is established by evidence that the plaintiff was a member of a protected class; he or she was qualified for the position sought or was performing competently in the position he or she held; he or she suffered an adverse employment action; and circumstances suggest discriminatory motive. (*Ibid*.)

In Y*anowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 (*Yanowitz*), the court explained that the determination of what type of adverse treatment should be considered discrimination is not susceptible to a mathematically precise test, and the legal significance of an employer's actions must be evaluated by taking into account the legitimate interests of both the employer and the employee. Relatively trivial actions that are "reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job performance or prospects for advancement[] or promotion falls within the reach of the antidiscrimination provisions of" the FEHA. (*Id.* at pp. 1054–1055.)

"When a plaintiff alleges a series of actions that comprise a course of conduct, we need not examine each individually.

17

Instead, we consider the totality of the circumstances to determine whether the plaintiff has suffered an adverse employment action.  '[T]here is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries.  [Citations.]  Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute.'  [Citation.]"  (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 92 (*Light*).)

### 2.  *Retaliation*.

A retaliation claim under Government Code section 12940, subdivision (h) is analyzed using the same burden shifting framework as a discrimination claim.  To establish a prima facie case, a plaintiff must show:  he or she engaged in protected activity, the employer subjected the employee to adverse employment action, and there is a causal link between the two.  (*Yanowitz, supra*, 36 Cal.4th at p. 1042.)  A retaliation claim based on Labor Code section 1102.5 follows suit.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 287; *Morgan v. Regents of University of Californi*a (2000) 88 Cal.App.4th 52, 68 [applying the same analysis to FEHA and Lab. Code, § 1102.5 retaliation claims].)

### 3.  *Relevance of Federal Cases*.

"Because the objectives and wording of Title VII of the Civil Rights Act of 1964 [citation] are similar to that of [the] FEHA, California courts often look to federal cases for assistance in interpreting [the] FEHA.  [Citation.]"  (*Sheffield v. Los Angeles County* (2003) 109 Cal.App.4th 153, 160.)

18

B. <u>Analysis of Employment Actions</u>.

1. *Job Reassignment; Transfer; Workspace.*

Obi contends that he suffered an adverse employment action when he was reassigned from Web development to overseeing infrastructure such as air-conditioning because the position was less desirable given his background and experience. But he does not establish this as true because he has not presented us with all the relevant circumstances regarding the Data Systems Bureau and/or the Administration Unit. Presumably, he wanted to continue working in Web development, or in a capacity that would allow him to use his education in computer science. But he asked to be reclassified as a POSA— which resulted in an increase in his compensation—and he offers no evidence that there was an available POSA position that would have allowed him to work in his preferred field.[9] Also, it cannot be ignored that he did not want to be a PISA. Though a "job reassignment may be an adverse employment action when it entails materially adverse consequences" (*Simers v. Los Angeles Times Communications LLC* (2018) 18 Cal.App.5th 1248, 1279), we have no basis to conclude that Obi's reassignment was materially adverse by any pertinent metric. Moreover, case law explains that a change that is merely contrary to an employee's desires is insufficient to be adverse. (*McRae v. Department of Corrections & Rehabilitation* (2006) 142 Cal.App.4th 377, 386.) ""'[W]orkplaces are rarely idyllic retreats, and the mere fact that

---

[9] The October 11, 2017, Administration Unit organization chart lists only three supervisors on the same level as Obi: two POSAs (Obi and Kaiser Den) and a DBA (Mao Sok). The level above Obi, "I.T. Spec I," lists Huynh and Bryan Fong. Above that level is an "I.T. Spec II" (Chua) and an "OA II" (Spring Sheng).

19

an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action."'" (*Ibid.*)

Though he suggests otherwise, *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359 (*Horsford*) does not dictate a conclusion that favors Obi. The court explained that "[w]hen a police lieutenant . . . is removed from his former position near the top of the department's chain of command, and then is removed entirely from law enforcement duties, the objective terms and conditions of employment have been adversely affected. When that same veteran police administrator is transferred to head a department in which he has no training or expertise (and in which position he was inferably expected to fail), the terms and conditions of employment have been adversely changed." (*Id.* at p. 374.) Here, Obi was not removed, he was reclassified as a POSA at his request when the Department reorganized, and there is no indication in the record he could have continued in Web development while working as a POSA.

He objects to his transfer to the SCC, calling it an undesirable location. Based on what he has told us, however, we cannot assess why this was materially adverse. He was sent there as a POSA, a reclassification he requested. Obi's briefs do not inform us whether, as a POSA, there was an available position for him in Norwalk. He cites *Milano v. Aguilerra* (S.D. Cal., Mar. 8, 2013) 2013 U.S. Dist. LEXIS 32797, *26, for the proposition that a transfer against an employee's wishes "can be viewed as an adverse action. [Citation.]" We have no dispute with this observation. But it does not, by itself, provide a foothold for finding that the transfer to the SCC was adverse

20

action.  Simply put, context matters, and Obi has not provided sufficient context to bring his argument home.

Though Obi lost his private office, he has not sufficiently painted the picture for us to determine whether that was simply part and parcel with his job reassignment and relocation, which he has not shown were adverse.  If it was, we cannot separate them analytically.  Further, Obi has not provided evidence that others in his position had private offices and that he, therefore, was denied a privilege, and that this impaired his chances for advancement or promotion because his lack of an office would be viewed as a negative.

      2.  *E-mails; Log Entries; Expectation Plans; Daily Logs.*

Obi maintains that the e-mails from supervisors, Log Entries, Expectation Plans and daily logs pertaining to him constitute negative evaluations and qualify as adverse employment actions.  For the sake of argument, we accept that they are evaluations.  But we cannot accept that they qualify as adverse employment actions under the FEHA.

"[A] mere oral or written criticism of an employee . . . does not meet the definition of an adverse employment action under [the] FEHA.  [Citations.]" (*Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1457 [citing Title VII law].)  But "[a]n unfavorable employee evaluation may be actionable where the employee proves the 'employer subsequently use[d] the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'  [Citations.]  Thus, . . . where the employer wrongfully uses the negative evaluation to substantially and materially change the terms and conditions of employment, this conduct is actionable." (*Ibid.*; see also *Brooks*

21

*v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 929 ["an undeserved negative performance review" can constitute an adverse employment decision].)

Obi does not posit that these evaluations were used to substantially and materially change the terms and conditions of his employment in a manner that would impair a reasonable employee's job performance or prospects for advancement or promotion. In contradictory fashion, he states: "[D]espite the barrage of negative evaluations, [he] consistently received positive performance reviews between 2013 and 2017[.]" Because Obi has not provided a cogent argument, this issue requires no analysis.[10]

3. *Amount and Reasonableness of Work.*

Obi argues that the Department took adverse employment action by giving him an unreasonable amount of work. Per Obi, the proof is that the Department issued an Expectation Plan that precluded him from delegating tasks to subordinates without prior approval from Chua or Huynh; it issued an Expectation Plan that imposed numerous, onerous restrictions; and Chua and Huynh assigned the HyperV project to Obi even though he had a full work load and no experience with HyperV.

We accept that extra work can impair a reasonable employee's job performance. As the Ninth Circuit has held, "Assigning more, or more burdensome, work responsibilities, is an adverse employment action." (*Davis v. Team Elec. Co.* (2008)

_____

[10] Obi contends that his evaluations were baseless. Though it is moot, he suggests that he was performing competently. He did not, however, allege this in the SAC. In the SAC he alleged, and on appeal he now argues, that he did not receive proper training. If he was performing competently, then how could he have been deprived of necessary training?

520 F.3d 1080, 1089.)  The question remains whether Obi was, in fact, assigned extra work.

The fact that Obi needed approval to delegate tasks to subordinates is not proof that he was ever denied approval and therefore had extra work.  Obi has not identified the numerous, onerous restrictions of which he complains, nor has he explained how they added to his work load.  That leaves us with the HyperV project.  But he refused to work on that project and was eventually removed from it.  Thus, the HyperV project could not have led to extra work and therefore could not have impaired Obi's performance.

4. *Threats*.

Obi argues that the numerous statements that he would be demoted or removed if he did not perform amounted to adverse employment action.  His argument must be rejected because the two cases he relies on are inapposite.

First, he cites *Brodheim v. Cry* (9th Cir. 2009) 584 F.3d 1262, 1270, a case in which an inmate sued a prison official for retaliating against him for exercising his First Amendment right to petition the government for redress of grievances.  The court stated, inter alia, "[T]he mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect." (*Id*. at p. 1270.)  Given that this holding is not related to a Title VII claim, it is not relevant to our analysis of the FEHA.

Second, he cites *Yanowitz*.  It involved a manager who refused to carry out an order from a male supervisor to fire a female sales associate because she was not sufficiently attractive.  Due to her refusal, the manager was subjected to "heightened scrutiny and increasingly hostile adverse treatment that

23

undermined her relationship with the employees she supervised and caused severe emotional distress that led her to leave her position." (*Yanowitz*, *supra*, 36 Cal.4th at p. 1035.) She sued for retaliation for acting to protect FEHA rights. (*Ibid*.) The court stated that "[m]onths of unwarranted and public criticism of a previously honored employee, an implied threat of termination, contacts with subordinates that only could have the effect of undermining a manager's effectiveness, and new regulation of the manner in which the manager oversaw her territory" were meant to punish the manager and put her career in jeopardy. (*Id*. at p. 1060.) The court then stated that "[a]ctions that threaten to derail an employee's career are objectively adverse." (*Ibid*.) *Yanowitz* did not examine whether nonpublic statements by supervisors to an employee about the consequences of failure to perform legitimate tasks constitute adverse action under the FEHA, and its holding therefore offers us no guidance.

### 5. *Loss of Supervisory Authority*.

Obi suggests that he suffered adverse action because he was deprived of supervisory authority when: Suede criticized him in an e-mail shared with Hallie, a subordinate; Chua issued an Expectation Plan that precluded him from delegating tasks to subordinates without approval from Chua or Huynh; Chua and Huynh permitted Gipson, a subordinate, to participate in the creation of a Log Entry for him; Chua and Huynh objected when he wrote a Log Entry for a subordinate; Chua and Huynh transferred him to the SCC where he eventually supervised only one subordinate; and they deprived him of his private office.

The one case Obi cites is *Lelaind v. City & County of San Francisco* (N.D. Cal. 2008) 576 F.Supp.2d 1079. Relevant here, the manager in the case had criticized a supervisor for

months for not knowing how to handle her crew, rescheduled members of her crew, undermined her authority, and shut her out of meetings.  (*Id*. at pp. 1097–1098.)  The federal district court judge concluded there was a triable issue as to whether a manager took adverse action against a supervisor that could "negatively and materially affect[] [her] authority and effectiveness as a manager as well as her ability to acquire and develop skills to advance up the career ladder."  (*Id*. at p. 1098.)

We conclude that the criticism of Obi in Suede's e-mail was too isolated and trivial to be sufficiently adverse.  Also, there is no indication that Gipson worked under Obi's supervision, and that her participation in creating a Log Entry for Obi undermined his supervisory authority over his own subordinates.  The facts are not developed thoroughly enough for us to determine whether Chua's and Huynh's objection to the Log Entry authored by Obi can be construed as sufficiently adverse.  And, as we have previously indicated, Obi has not shown that his transfer to the SCC and loss of a private office amount to actionable adverse employment action under the FEHA.

This leaves us with the Expectation Plan that prohibited Obi from delegating tasks without approval.  Conceivably, this action could be adverse.  But, as we discussed in part III.B.2. of the Discussion, Obi has not explained how this could impair his prospects for advancement or promotion.  As he admits, he received positive performance reviews.  He provides no record citations indicating that the Expectation Plan will remain in his personnel file or otherwise cause him problems.

25

6. *Level of Training*.

Though the record indicates that Obi received at least some training, he maintains that he was denied training and that the Department set him up to fail.

In support, Obi relies on *Light*. It held that "the denial of previously promised training and the failure to promote may constitute adverse employment actions" (*Light*, *supra*, 14 Cal.App.5th at p. 93) under the following facts. After an employee refused to divulge what she discussed with investigators regarding a colleague's discrimination and harassment claims against a supervisor, that supervisor isolated the employee, moved her to a different office, verbally and (to some extent) physically attacked her during a confrontation, and told her she could not work in his department when her current out-of-class assignment ended. Also, a different colleague rescinded the offer to train the employee for a technician position, and she was later rejected for promotion to that very position despite having previously served in it during an out-of-class assignment. Her department ultimately left the position vacant despite calling it mission critical. Then, her department reduced her hours to zero. (*Id*. at pp. 92–93.)

*Light* is not on point. Obi has not alleged or offered evidence indicating that he was denied specified training that he needed to succeed or advance. Though he vaguely suggests he was adversely impacted by not receiving training, he also contends that he was performing competently. His briefs are internally inconsistent.

At points in his appellate briefs, Obi implies that he should have received HyperV training. But the record indicates he was given or offered training and he simply deemed it inappropriate

because he was not an electrical engineer. He does not contend that the Department should have sent him to engineering school, or that he was willing to go. Whether there is different HyperV training he thinks he should have been offered, we are left to speculate. Regardless, HyperV was merely one project, and he refused to participate, calling it fake. Also, his refusal did not change his performance rating.

Simply put, Obi has not offered evidence of specific training that he was denied, nor has he offered evidence that the denial was detrimental to his career.

### 7. *Totality of the Circumstances*.

Regarding the totality of the circumstances, all Obi argues is this: "Considering [his] evidence collectively, under a totality-of-the circumstances approach, it is evident that he has satisfied the minimal requirement of demonstrating a prima facie case that the Department engaged in numerous adverse employment actions." His argument is a "general assertion, unsupported by specific argument." (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) He "apparently assum[es] this court will construct a theory supportive of his" appeal, but that "is not our role." (*Ibid*.) "One cannot simply say the court erred, and leave it up to the appellate court to figure out why. [Citation.]" (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.)

C. <u>Link to Racial or National Origin Animus</u>.

Having concluded that there were no adverse employment actions, we need not consider whether anything the Department did is linked to proscribed animus.

## IV. Fifth Cause of Action for Failure to Prevent Discrimination; Ninth Cause of Action for IIED.

Obi argues that if we find triable issues as to race and national origin discrimination, then there are triable issues as to failure to prevent discrimination and IIED because they are based on the same facts. For the reasons previously discussed, there are no triable issues.

## V. Costs.

Obi challenges the cost award on the initial theory that a trial court cannot award costs to a prevailing defendant on FEHA causes of action unless the trial court finds that those causes of action were frivolous. (Gov. Code, § 1265, subd. (b); *Williams v. Chino Valley Independent Fire Dist.* (2015) 61 Cal.4th 97, 115.) Here, the trial court previously and specifically found that those causes of action were not frivolous.

This challenge faces two insurmountable hurdles.

First, in a mixed case involving both FEHA causes of action and nonFEHA causes of action and a finding that the former cannot be called frivolous, a trial court can still award costs that are allocable to the nonFEHA claims. (*Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1062.) Obi has not established that the trial court did not or could not allocate all costs to the nonFEHA causes of action, namely the sixth cause of action for negligent hiring, supervision, and retention, the ninth cause of action for IIED, and the tenth cause of action for retaliation in violation of Labor Code section 1102.5. If an argument is not

28

made, it is waived.  (*Tan v. California Fed. Sav. & Loan Assn.* (1983) 140 Cal.App.3d 800, 811.)  We observe that at least the ninth and tenth causes of action are arguably based on the same facts as the FEHA causes of action and would have triggered the same litigation expenses.  If that is true, then the respondents would have incurred all the same costs for filing fees, motion fees, etc., even if Obi had not alleged any FEHA causes of action.  And if that is true, all costs could have been allocated to the nonFEHA causes of action.  Consequently, Obi has not shown that the trial court erred or, if it did err, that he suffered prejudice as a result.

Second, the California Rules of Court provide that a prevailing party who claims costs must serve and file a cost memorandum.  Any notice of motion to strike or tax costs must be filed 15 days later.  The party claiming costs and the party contesting costs may agree to extend the time for serving a motion to tax or strike costs.  In the absence of an agreement, the trial court may extend the time for a period not to exceed 30 days.  When the time for a determination of that motion has passed, the clerk must enter costs on the judgment.  (Cal. Rules of Court, rule 3.1700.)  The failure to file a motion to tax costs constitutes a waiver of the right to object.  (*Douglas v. Willis* (1994) 27 Cal.App.4th 287, 289 (*Douglas*).)

Because Obi only challenged a fraction of costs in his notice of motion, it stands to reason under *Douglas* that he waived his challenge to the other costs.  Obi offers no legal citations or argument establishing that he could, by right, ask to strike all requested costs in a reply brief when his notice of motion to tax costs and his initial moving papers only sought to strike a fraction of the costs.  Moreover, he provides no discussion of whether substantial evidence supported the trial court's findings

29

of waiver and estoppel. "It is not our responsibility to develop an appellant's argument." (*Alvarez v. Jacmar Pacific Pizza Corp., supra,* 100 Cal.App.4th at p. 1206, fn. 11.) Undeniably, Obi has not demonstrated error or that he was prejudiced if in fact the trial court did err.

In seeking reversal, Obi also contends that the finding that the FEHA causes of action were not frivolous triggered the collateral estoppel and law of case doctrines and compelled the trial court to deny all costs.

We disagree.

Collateral estoppel only arises when an issue was decided in a prior proceeding and a party seeks to relitigate it in a subsequent proceeding. The decision in the prior proceeding must be final and on the merits. (*Gikas v. Zolin* (1993) 6 Cal.4th 841, 849.) Here, Obi does not establish that the ruling on respondent's motion for attorney fees and costs occurred in a prior proceeding as opposed to the same proceeding as the ruling on the motion to tax costs. Also, Obi does not establish that the ruling on respondent's motion for attorney fees and costs was final at the time of the later hearing. Regardless, what the trial court ruled with respect to the FEHA causes of action at a previous hearing has no impact on costs as they relate to the nonFEHA causes of action.

"Under the law of the case doctrine, when an appellate court "'states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout [the case's] subsequent progress, both in the lower court and upon subsequent appeal. . . .'" [Citation.] . . . As its name suggests, the doctrine applies only to an appellate court's decision on a question of law;

30

it does not apply to questions of fact." (*People v. Barragan* (2004) 32 Cal.4th 236, 246.)  Contrary to what Obi suggests, the law of the case doctrine does not apply to trial court rulings in California.  (*People v. Sons* (2008) 164 Cal.App.4th 90, 100.)[11]  As one court further explained, "The rulings of a trial court during an earlier stage in the proceeding are not conclusive."  (*Ball v. County of Los Angeles* (1978) 82 Cal.App.3d 312, 325, fn. 1.)  Thus, the trial court's ruling on the motion for attorney fees and costs was not law of the case.  But even if it was, it would not impact the trial court's ability to allocate all costs to the nonFEHA related causes of action and then award those costs.

All other issues are moot.

---

[11]    To establish that the law of the case doctrine applies to trial court rulings, Obi cites *Musacchio v. United States* (2016) 136 S.Ct. 709, 716 and *United States v. Alexander* (9th Cir. 1997) 106 F.3d 874, 876.  Neither case stands for that proposition. Even if they did, it would be irrelevant.  Obi offers no explanation as to why federal law is applicable.  We conclude that this is a matter of state law, not federal law, because the law of the case is a judicially created doctrine.  Moreover, it does not implicate any issues under the United States Constitution.

## DISPOSITION

The judgment and cost order are affirmed.  Respondents shall recover their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.



_____, Acting P. J.
ASHMANN-GERST


We concur:



_____, J.
CHAVEZ



_____, J.
HOFFSTADT