Filed 7/24/24  P. v. Gonzalez CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MISAEL GONZALEZ,<br><br>Defendant and Appellant. | F085805<br><br>(Super. Ct. No. F21906587)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Timothy A. Kams, Judge.

Law Office of Nicco Capozzi and Nicholas Anthony Capozzi for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Misael Gonzalez was convicted of one count of attempted premeditated murder, three counts of shooting at an inhabited dwelling, and related offenses stemming

from a gang-related shooting spree. The jury also found gang enhancement allegations true. He was sentenced to a total term of 85 years to life plus 15 years. He raises three contentions on appeal. He first contends the trial court violated Penal Code section 1109[1] by allowing some gang evidence in the first phase of his bifurcated trial. He also argues the court erred in denying his motion for a separate trial or jury from his codefendant. He also contends the court committed sentencing error under amended section 1385. We affirm, but we order the abstract of judgment amended to correct discrepancies between it and the oral pronouncement of judgment.

## STATEMENT OF THE CASE

The Fresno County District Attorney filed a third amended information charging Gonzalez with attempted premeditated murder (§§ 664/187, subd. (a); count 1); three counts of shooting at an inhabited dwelling (§ 246; counts 2, 5, & 6); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 7); carrying a concealed firearm in a vehicle (§ 25400, subd. (a)(1); count 8); carrying a loaded firearm in public (§ 25850, subd. (a); count 9); and street terrorism (§ 186.22, subd. (a); count 14). Counts 3, 4, 10, 11, 12, and 13 charged only Gonzalez's codefendant, David Sanchez.

As to counts 1 and 2, it was alleged Gonzalez and/or Sanchez personally and intentionally discharged a firearm which proximately caused great bodily injury or death. (§ 12022.53, subds. (d) & (e)(1).)

As to counts 1, 7, 8, and 9, it was alleged the offense was committed for the benefit of, at the direction of, or in association with the criminal street gang, Eastside Fresno/Fifth Street Bulldogs, with the specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(1).) As to counts 2, 5, and 6, it was alleged the offense was committed for the benefit of, at the direction of, or in association with the criminal street gang, Eastside Fresno/Fifth Street Bulldogs, with the

---

[1] Undesignated statutory references are to the Penal Code.

specific intent to promote, further, or assist in criminal conduct by gang members. (§ 186.22, subd. (b)(4)(B).)

As to counts 8 and 9, it was alleged that Gonzalez was an active participant in a criminal street gang. (§§ 25400, subd. (c)(3), 25850, subd. (c)(3).) Also as to counts 8 and 9, it was alleged Gonzalez had suffered two prior felony convictions (§§ 25400, subd. (c)(1), 25850, subd. (c)(1)).

The information also generally alleged that Gonzalez had suffered a prior strike conviction within the meaning of the Three Strikes law (§ 667, subds. (b)–(i)) and a prior serious felony conviction (§ 667, subd. (a)(1)).

The trial court granted Gonzalez's motion under section 1109 to separately try his gang enhancement allegations and the street terrorism count from the rest of the charges. Gonzalez and Sanchez were tried together before the same jury; Sanchez is not party to this appeal.

A jury found Gonzalez guilty as charged on counts 1, 2, 5, 6, 7, 8, and 9. As to count 1, the jury found the attempted murder was done willfully and with premeditation and deliberation.

In bifurcated proceedings, the court found Gonzalez guilty of count 14 (street terrorism) and found true all enhancement allegations except for the gang enhancement attached to count 5.

On February 7, 2023, Gonzalez was sentenced to a total term of 85 years to life plus 15 years.

3.

I.      **Prosecution's case**

   A.      **First shooting**

On May 26, 2020,[2] M.L. lived in a house in Fresno with his two children.  Around 2:30 a.m., M.L.'s son heard a car stop in front of their house and people knocking on the door.  M.L., who was asleep on the couch, heard the knocking, yelled, "Who is it?" and was met with cursing and demands for "Richie" and "Sonny."  M.L. informed them they had the wrong house, but they cursed and pounded on the door.  M.L. backed away, sensing danger, and was shot through the door; the bullet entered above his right eye.  His son hid under his bed and called 911.  His daughter, hearing the noise, took cover after hearing gunshots and glass shattering.  His son and daughter emerged to help their father, who was bleeding and had lost vision in his right eye.  A police officer responded, locating a surveillance camera that captured a white Dodge speeding away.  Eight expended .45-caliber shell casings were recovered.

   B.      **Second shooting**

Also on May 26, L.C. lived at a home in Fresno and discovered a shooting had occurred when he viewed surveillance footage showing a white car shooting at his house.  The house was damaged, but no one was harmed.  He emailed the footage to detectives.

   C.      **Third shooting**

J.H. lived at a home in Fresno.  Around 5:30 a.m. on May 26, he woke up to knocking and gunshots.  He and his girlfriend took cover.  He found bullet holes in his couch and wall.  Surveillance footage showed a white car and two men shooting after knocking.  Bullet holes and four shell casings were found outside.

About a year earlier, J.H. was walking to a store across the street from his house when two men approached him.  One of them asked, "What's up dog?", which made J.H.

---

[2] All references to dates are to the year 2020 unless otherwise noted.

believe the man was "gang banging" on him. A few minutes later, J.H. left the store and saw the two men surrounding another man. As he walked home, he heard gunshots and started running. He was then shot in the leg. J.H. spoke with police when they arrived on scene.

D.     Police investigation

In the early morning hours of May 26, Deputy Todd Burk was patrolling the area covering J.H.'s home. Around 3:30 a.m., he found a white Dodge Dart parked at the curb with its brake lights on. He saw people in the car and described the man in the driver's seat as a young Hispanic male. Deputy Burk ran the license plates on the car and learned the car was registered to J.O.T., who did not live in the area.

On May 26, around 6:00 a.m., Detective Ryan Rockwell responded to the third shooting, at J.H.'s home. He watched the surveillance videos captured by J.H.'s camera. While investigating that shooting, he received information from the Fresno County Sheriff about the white Dodge Dart that Deputy Burk encountered. Detective Rockwell went to the registered owner's address and left his business card since no one answered.

Detective Rockwell spoke with the Dart's registered owner, J.O.T., the next day. J.O.T. said his daughter, G.T., drove the car. Detective Rockwell went to where G.T. worked and found the car in the back parking lot. He went inside and spoke with G.T., who said that her sister, M.B., had her car during the time frame of the shootings. M.B. also worked at the same place, so Detective Rockwell spoke with her.

While being questioned, M.B. was "very timid." She avoided eye contact, was slouched over, and "seemed afraid." Detective Rockwell felt she was hesitant to speak with him and was withholding information. M.B. said she was drinking in Calwa with her friend, M.P., at the time of the shootings. But her story changed after Detective Rockwell showed her video from the third shooting (at J.H.'s home). She then said she came across some "random guys" wearing masks who started "flirting with her" and M.P.

5.

Detective Rockwell took M.B.'s cellphone as evidence, and fingerprints and DNA evidence were taken from the car. A cellphone was found under the driver's seat and a .45-caliber shell casing was on the exterior windshield. The crime scene technician who processed the car that day provided the name David Sanchez to Detective Rockwell, prompting Detective Rockwell to go back to speak with M.B.

The next day, Detective Rockwell showed M.B. a photo lineup which included Sanchez's picture.[3] M.B. did not make any identification. M.B. again acted afraid and said she did not want to talk to anyone. But she did consent to have her cellphone and social media accounts searched.

On May 29, Detective Rockwell spoke with M.P. at her house. M.P.'s story initially aligned with M.B.'s story in that she said they went to a park and drank on the night of the shootings. But then she "broke down" and told the detective she wanted to tell the truth. Her story changed "significantly." Detective Rockwell showed her a video of the third shooting (at J.H.'s house), which prompted M.P. to provide the nicknames and Facebook information for people she could identify in the video.

By June 1, Detective Rockwell had location information for M.B.'s cellphone, which placed her at all three shootings. On June 4, Detective Rockwell interviewed M.P. again and showed her two photo lineups—one containing Gonzalez and one containing another person, Michael Real.[4] M.P. shared that M.B. planned to call Sanchez to figure out what M.B. should tell the police when she was questioned.

The eight shell casings found at the first shooting scene and the four found at the third shooting scene were analyzed. Five of the eight casings from the first shooting were determined to have been fired from the same gun; it could not be determined whether the

---

[3] The photo lineup was presented to M.B. by a "blind administrator" while Detective Rockwell was present.

[4] Again, the photo lineup was presented by a "blind administrator" while Detective Rockwell was present.

other three were fired from the same or a different gun. As to the four casings from the third shooting, it was determined that at least two different guns were used to fire those four shots, and one of the casings from the third shooting was fired in the same gun as the five casings from the first shooting. Further, Gonzalez and Sanchez could not be ruled out as contributors of some of the DNA evidence taken from the white Dodge.

### E. Cellphone evidence

After Sanchez was arrested, his cellphone was recovered, which contained contacts for Real, M.B., and Gonzalez. Investigators managed to extract information from the SIM card of the phone found in the white Dodge, and they determined that the number to that phone was Gonzalez's.

There were calls between Sanchez, Gonzalez, Real, and M.B. the night of the shootings. At 11:20 a.m. on May 26, hours after the shootings, Sanchez messaged M.B.: "Check if I left that gun in your car." M.B. also messaged Sanchez that day stating that police went to her house, but her brother did not answer the door. On May 27, M.B. again messaged Sanchez, asking if she could come over after work to talk to him.

### F. M.B.'s testimony

M.B. met Real in 2018 and they began dating in 2019. Late at night on May 25, M.P. called M.B. to tell her not to go out. After that, Real called M.B. and told her to come where he was because Sanchez was drunk and needed a ride home. M.B. took her sister's car, the white Dodge, and drove to Gonzalez's mother's house, where Real, Sanchez, and Gonzalez were drinking. She began drinking with Real, Sanchez, and Gonzalez.

The four of them left Gonzalez's mother's house and got into the Dodge. Real was driving, Gonzalez was in the front passenger seat, and Sanchez and M.B. were in the back. As they were driving, Real said, "Let's go to the hood."

They arrived at the house where the first shooting occurred, and Gonzalez and Sanchez got out of the car. M.B. did not see where they went but heard gunshots and Gonzalez and Sanchez got back into the car. M.B. was scared and said nothing.

After a while, the group went to Sanchez's apartment because M.B. needed to use the restroom. Sanchez went to sleep. At the apartment Real threatened M.B., telling her he would hurt her if she spoke about what happened. This scared her, and she was still scared while on the witness stand.

Real and M.B. went outside and got back in the car where Gonzalez was waiting. At some point some another man got in the car who M.B. did not know. After driving around some more, M.B. needed to use the restroom again. They tried going to a friend's house, but no one was home. Real then drove to another house, and the car stopped and M.B. heard more gunshots. M.B. had her head down. The group then went back to Gonzalez's mother's house.

Later on, Gonzalez, Real, M.B., and the third man got back in the car and began driving around again. After a while, Real, who was still driving, began circling a house near Gonzalez mother's house. M.B. thought they were looking for a place to park. The car stopped near the house and Gonzalez and the third man got out of the car and went to the front door. Gonzalez and the third man walked back to the car and M.B. heard gunshots. M.B. was scared and said nothing.

The group then went to a gas station and made another stop where the three men got out of the car. M.B. got into the driver's seat and thought about driving away but was afraid she would get shot at. M.B. then drove each of the three men home. As she dropped off Gonzalez last at his mother's house, she saw lots of police and got scared. She then went home.

M.B. called M.P. when she got home and told her about the shootings. She also deleted Real's number and deleted all text conversations with Gonzalez and Sanchez. She found out later that day at work that police had come to her house. She called

8.

Sanchez because she had no way of contacting Real. She also wanted to tell Sanchez that police were looking for her. Sanchez also sent a message to M.B.: "Check if I left that gun in your car." M.B. said she would when she got off work.

M.B. admitted she lied to Detective Rockwell when she said she had been hanging out in Calwa with M.P. the night of the shootings because she was scared to tell the truth. She was still scared when she spoke with Detective Rockwell again on May 28; she was afraid of what would happen if she spoke with police. She also lied about not recognizing Sanchez and Real in photo lineups and about her relationship with Real.

On June 9, she spoke with police again, this time with a lawyer, because she wanted to give a more accurate account of what happened. She identified Sanchez in another photo lineup that day. She said Real, Sanchez, and Gonzalez were Fresno Bulldog gang members.

About a year before the trial, M.B. received threatening messages on Facebook, some of which told her to not testify. One of the messages said, "If you [testify], ain't no telling what's going to happen after that." M.B. blocked that account but was too scared to tell anyone she had received the threats because she did not want to be labeled a "snitch" and did not want anyone to "come after [her]."

### G. M.P.'s testimony

M.P. and M.B. had been friends for eight years and were close. M.P. knew Real, Sanchez, and Gonzalez. She also stated M.B. often borrowed her sister's white Dodge. Around 7:00 a.m. on May 26, M.B. called M.P. and told her there were three drive-by shootings that night, during which Real, Sanchez, and Gonzalez were present. M.B. said Real had been driving the car. M.P. and M.B. spoke again on May 26 and M.B. said she was scared because police wanted to talk to her. M.B. also told M.P. what to tell police if questioned.

When M.P. was interviewed by Detective Rockwell, she initially said she had called M.B. to go out. But she changed her story once Detective Rockwell said M.B. had

9.

identified M.P. as the driver during the shooting. M.P. identified Gonzalez in one of the surveillance videos from one of the shootings and provided his Facebook information to Detective Rockwell.

### H. Gang expert's testimony

Detective Eric Cervantes is a member of a multi-agency gang taskforce and specializes in the Fresno Bulldogs. He said the Bulldogs use intimidation and retaliation tactics to keep themselves from being arrested and to better allow themselves to commit crimes. Detective Cervantes said a "snitch"—one who cooperates with law enforcement by providing information on a gang or gang member—faces consequences ranging from having a police report containing their name posted on social media to drive-by shootings.

The Bulldogs employ a range of tactics to intimidate witnesses, including sending anonymous text messages, social media posts, and gang graffiti. They will also pack a courtroom full of gang members while the witness is testifying. Witnesses' families are often targeted because witnesses are more afraid when their families are at risk. The gang member who committed a crime is not always the one doing the intimidating; sometimes a fellow gang member or family member will do it. The Bulldogs also use retaliation as revenge for disrespect or other wrongs. Gang members feel disrespected or wronged if a witness cooperates with police or testifies in a case.

## II. Defense cases

Gonzalez's stepfather, Jesse Sustaita, testified in his defense. He stated that Gonzalez lived with him and Gonzalez's mother regularly in their one-bedroom apartment. Sustaita hosted a barbeque on May 25 which Gonzalez attended. After the barbeque, Sustaita locked up the apartment while Gonzalez was in the living room. He locked the deadbolt every night around 9:30 or 10:00 p.m. and he was the only one with the key.

Cary Tanner, M.D., an orthopedic surgeon, testified in Sanchez's defense. He testified that Sanchez's right arm was injured during birth, resulting in the arm being shorter and smaller than the left arm. In his opinion, Sanchez could not make some of the arm motions caught on the surveillance videos.

Neither Sanchez nor Gonzalez testified on their own behalf.

## DISCUSSION

### I.      Penal Code section 1109

Gonzalez argues the trial court erred under section 1109 when it allowed limited gang evidence during the first phase of his trial. The People contend that although the trial court granted bifurcation of Gonzalez's street terrorism charge and gang enhancement allegations, the limited gang evidence was admissible in the trial's first phase to prove motive, retaliation, and witness intimidation. We agree with the People.

#### A.      Background

The trial court granted the defendants' motion under section 1109 to bifurcate the trial on the gang enhancement allegations and street terrorism count from the trial on the underlying offenses. Gonzalez then filed a written objection before trial to exclude any gang evidence during the first phase of the trial—the trial on the underlying offenses. He argued that any gang evidence would be highly prejudicial because J.H. was not in a gang. The People argued in opposition that limited evidence of intimidation and retaliation should be allowed because M.B.'s credibility would be at issue.

After a hearing, the court ruled it would allow M.B. to testify that she believed the defendants and Real were Bulldog gang members and would allow the prosecution's gang expert to testify about the Fresno Bulldogs' practice of intimidating and retaliating against people who cooperate with police. The court stated this evidence was relevant to M.B's credibility and to the motive for the shooting involving J.H. The court ruled it would not allow evidence of the ballistics comparison between the first and second shootings of J.H. or evidence of the habits and activities of gangs.

11.

## B. Law and analysis

Section 1109 requires on defense request a gang enhancement allegation to be tried separately from the underlying offenses. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1206 (*Tran*).) But section 1109 does not mandate exclusion of gang evidence in the non-gang portion of a bifurcated proceeding. Rather, gang evidence may be admitted "to prove other facts related to a crime." (*Tran,* at p. 1208.) As our Supreme Court has held, "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to the guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)

"We review the trial court's rulings regarding the admissibility of the evidence for an abuse of discretion. [Citation.] A trial court's decision to admit or exclude evidence ' " 'will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.' " ' " (*People v. Mataele* (2022) 13 Cal.5th 372, 413–414.)

The gang evidence here was relevant to establish the retaliatory motive of the shooting at J.H.'s home and also relevant to M.B.'s credibility. As to motive, the gang expert's testimony about the Bulldogs' retaliation tactics helped explain Gonzalez and Sanchez's motive for targeting J.H. J.H. testified that about a year before the May 20 shooting, he was shot while walking home after being approached by what he thought were two gang members. He spoke to police on the scene, and the gang expert explained that gangs will retaliate against people who speak with law enforcement about gang crimes. Thus, the gang expert's testimony explained the motive could have been retaliation for J.H.'s speaking with law enforcement after the shooting a year before.

The gang evidence was also relevant to M.B.'s credibility. M.B.'s testimony that she believed Gonzalez, Sanchez, and Real were gang members explained why she might

12.

have been reluctant to speak with law enforcement initially and why she was dishonest at first with Detective Rockwell. The reason for her fear was further illuminated by the gang expert's testimony about the Fresno Bulldogs' tactic of intimidating witnesses through threats of violence. " 'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible.' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 773, citing *People v. Burgener* (2003) 29 Cal.4th 833, 869; see CALCRIM No. 1403; accord, *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168–1169 [gang evidence may be relevant to witnesses' reluctance to testify and inconsistent statements]; *People v. Harris* (1985) 175 Cal.App.3d 944, 957 ["The trial court specifically and correctly found the evidence of gang membership to be admissible on the issue of credibility."]; see generally *Tran, supra,* 13 Cal.5th at p. 1209 ["We have held that a trial court is entitled to admit evidence demonstrating a fear of testifying."]; *People v. Sanchez* (1997) 58 Cal.App.4th 1435, 1449–1450 (*Sanchez*) ["Testimony a witness is fearful of retaliation similarly relates to that witness's credibility and is also admissible. [Citation.] It is not necessary to show threats against the witness were made by the defendant personally, or the witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible."].)

Gonzalez argues the gang evidence was improperly admitted for two reasons. First, there was no evidence that J.H. was a gang member himself. But it is not relevant that J.H. was not in a gang. The gang expert's testimony conveyed that the Fresno Bulldogs would intimidate and retaliate against anyone, not just other gang members.

Second, Gonzalez asserts that M.B.'s testimony that she believed Gonzalez and Sanchez were gang members and the gang expert's testimony about witness intimidation tactics were improperly admitted against him because Gonzalez himself did not threaten M.B. But this is irrelevant because as our Supreme Court explained, "[i]t is not necessary to show threats against the witness were made by the defendant personally, or the

13.

witness's fear of retaliation is directly linked to the defendant for the evidence to be admissible." (*Sanchez, supra,* 58 Cal.App.4th 1449–1450.) This is because the focus is on the witness's state of mind and the potential effect on their testimony, not on the source of the intimidation.

## II. Motion for separate trials or juries

Gonzalez next contends the trial court's denial of his motion for separate trials or juries was error. He moved the trial court to be tried separately from Sanchez, or to at least have separate juries, because it would unfairly prejudice him if the jury heard evidence of the text messages between Sanchez and M.B. about the gun. Also, though the record is unclear, it appears Gonzalez may have also moved for a separate trial or jury on the ground that some of the gang evidence admitted in the first phase of the trial would not be admissible against him in a separate trial. In any event, the trial court denied the motion, commenting that the gang evidence it was admitting in the first phase was "applicable to both defendants."

Gonzalez now asserts on appeal, without any supporting argument, that the admission of the evidence of the text messages between Sanchez and M.B. about M.B. checking for the gun in the car for Sanchez required separate trials or juries. We deem the issue forfeited for lack of reasoned argument.

"Mere suggestions of error without supporting argument or authority other than general abstract principles do not properly present grounds for appellate review." (*Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (2002) 100 Cal.App.4th 1066, 1078.) " '[O]ne cannot simply say the court erred, and leave it up to the appellate court to figure out why.' " (*People v. JTH Tax, Inc.* (2013) 212 Cal.App.4th 1219, 1237.) An appellant has the burden to establish error "by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655; see *Hodjat v.*

14.

*State Farm Mutual Automobile Ins. Co.* (2012) 211 Cal.App.4th 1, 10 ["an appellant is required to not only cite to valid legal authority, but also explain how it applies in his case"].) It is not an appellate court's responsibility to develop an appellant's arguments. (*Alvarez v. Jacmar Pacific Pizza Corp.* (2002) 100 Cal.App.4th 1190, 1206, fn. 11.) Appellate courts may, and ordinarily do, "disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287; see also *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 153 (*United Grand Corp.*).)

Not only does Gonzalez not provide any legal analysis, he also does not identify the correct legal framework. He cites section 954 as providing the applicable law, but that section relates only to the severance of charges for a single defendant; it does not relate to separate trials for multiple defendants. He also cites section 1109 as contributing to the legal framework, but section 1109 addresses bifurcation of gang charges and enhancements, not the severance of codefendant cases. Severance of codefendant cases is governed by section 1098, which provides that "[w]hen two or more defendants are jointly charged with any public offense … they must be tried jointly, unless the court order separate trials."

Gonzalez's failure to provide pertinent legal authority and legal analysis explaining how the trial court erred forfeits the issue. (*United Grand Corp., supra,* 36 Cal.App.5th at p. 165, fn. 6.)

## III. Penal Code section 1385

Finally, Gonzalez asserts the trial court abused its discretion in imposing "the various enhancements per … section 1385." His briefing seems to imply that the court failed to give great weight to mitigating factors, but he does not state which enhancements should have been stricken or which mitigating factors applied. In any

15.

event, we agree with the People that any issue he may wish to raise concerning section 1385 was forfeited by his failure to raise it below.

### *Section 1385*

On January 1, 2022, Senate Bill No. 81 (2021–2022 Reg. Sess.) went into effect (Stats. 2021, ch. 721, § 1), amending section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674.)

Section 1385, subdivision (c)(1), provides: "Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute." Section 1385, subdivision (c)(2), provides: "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

### *Forfeiture*

" 'A party in a criminal case may not, on appeal, raise "claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices" if the party did not object to the sentence at trial. [Citation.] The rule applies to "cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons." ' " (*People v. Scott* (2015) 61 Cal.4th 363, 406.) "Strong policy reasons support this rule: 'It is both unfair and inefficient to permit a claim of error on appeal that, if timely brought to the attention of the trial court, could have been easily

corrected or avoided. [Citations.]' [Citation.] ' " ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal." ' " ' " (*People v. Stowell* (2003) 31 Cal.4th 1107, 1114 (*Stowell*); accord, *People v. Salazar* (2016) 63 Cal.4th 214, 239–240; *People v. French* (2008) 43 Cal.4th 36, 46.)

The trial court did not specifically state that it gave weight to any mitigating factor or make a finding on the record that dismissal of any enhancement would endanger public safety. But the reason appears to be that it was not requested to do so. Moreover, Gonzalez did not object that the trial court failed to make an express finding that relief would endanger public safety or otherwise call the trial court's attention to what he now would characterize as errors entitling him to relief from the trial court's ruling, and there is no sign that he did not have an opportunity to do so.

Had Gonzalez objected or otherwise alerted the trial court to whatever errors he now complains of, the errors could have been corrected or the record otherwise developed as to the issues. "[A] party cannot argue on appeal that the trial court erred in failing to conduct an analysis it was not asked to conduct" (*People v. Fruits* (2016) 247 Cal.App.4th 188, 208, fn. omitted), and strong policy reasons support application of the rule in the situation presented here (*Stowell, supra,* 31 Cal.4th at p. 1114).[5]

## IV.    Abstract of judgment

We observe discrepancies between the oral pronouncement of judgment and Gonzalez's abstract of judgment which must be corrected. (*People v. Gobert* (2023) 89

---

[5] Gonzalez does not allege his trial counsel was ineffective for failing to raise section 1385 at sentencing.

17.

Cal.App.5th 676, 689 [oral pronouncement controls over minute order or abstract of judgment].)

At sentencing, after the trial court pronounced sentence on all counts as to Gonzalez, the court stated: "In addition, [the] nickel prior is imposed as to Count 1. As to Count 2, however, that count has been stayed. It's imposed as to Count 6." The court then noted that the total determinate term was 20 years. The "nickel prior" is the five-year prior serious felony enhancement under section 667, subdivision (a)(1).

The court then stated it was proceeding to impose fines and fees when the prosecutor interjected: "Judge, before you do that, the determinate term here, I have 15 years. I know you said 20 based on the 10 year plus 5." The 10-year term the prosecutor referenced was the term imposed on count 5.

The court replied: "You know I worked this out earlier today and I don't know if my notes reflect it. I think what I did, counsel, is essentially added it to Count 6, or applied it to Count 6. But in light of your comments, I think I'll modify the term to 15 years determinate. All the rest remains."

Thus, the court ultimately imposed the five-year prior serious felony enhancement under section 667, subdivision (a)(1), only once—either on count 1 or 6, but it is unclear which. The court also did not explain why it was imposing the enhancement on one of the counts but not the other. To that point, the court did not say that it was striking or staying the enhancement on any other count.

In any event, the abstract of judgment for the indeterminate portion of Gonzalez's sentence reflects the section 667, subdivision (a)(1), enhancement was imposed twice and stayed once, for a total of 10 years. But this is incorrect because the court imposed the enhancement only once and did not say it was staying the enhancement on any other count. Also, the enhancement is mistakenly listed once in the abstract (out of the three times it is listed) as "PC667(e)(1)" instead of as "PC667(a)(1)."

The abstract of judgment for the indeterminate portion of Gonzalez's sentence must be amended to reflect that the section 667, subdivision (a)(1), enhancement was imposed just once for a total of 5 years so that it conforms with the oral pronouncement of judgment. To that end, section 3 of the abstract of judgment for the indeterminate portion should list a single imposition of a five-year term under section 667, subdivision (a)(1). The two other listings of that enhancement in section 3 should be deleted.

## DISPOSITION

The judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment showing that the section 667, subdivision (a)(1), enhancement was imposed just once and forward certified copies to the appropriate entities.

SNAUFFER, J.

WE CONCUR:

SMITH, Acting P. J.

MEEHAN, J.

19.